THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. EDWARD DeLAIRE *et al.*, Defendants-Appellees.

Second District   Nos. 2—90—0953, 2—90—0954 cons.

Opinion filed January 28, 1993.—Rehearing denied March 5, 1993.

James E. Ryan, State's Attorney, of Wheaton (Barbara A. Preiner, Assistant State's Attorney, and William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Jerome Rotenberg, of Chicago, and George P. Lynch, of George Patrick Lynch, Ltd., of Downers Grove, for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:

The State appeals the order of the circuit court of Du Page County which suppressed evidence seized pursuant to a search warrant and the defendants' message unit detail (MUD) records obtained by a post-indictment grand jury subpoena. The circuit court entered an order of suppression in the causes against each defendant, Edward DeLaire and Donald Rippin. The appeals were consolidated because of the common facts and issues. The State contends the circuit court first erred in finding that citizens have a privacy interest in MUD records. Second, the State argues that the circuit court erred when it held that the evidence should be suppressed because the search warrant was obtained through a diversion of private information obtained by a grand jury subpoena *duces tecum*. The defendants also contend that the MUD records should be suppressed because the telephone company was not personally served with the subpoenas; that one subpoena was invalid because the grand jury had already completed its investigation when the subpoena was issued and served; that the search warrants authorizing the search of their residences were vague; and that the police failed to knock and announce their presence before entering Rippin's residence. All but the last two issues are of first impression in Illinois.

I

On December 1, 1989, the grand jury indicted Rippin for syndicated gambling, keeping a gambling place, and conspiracy to commit gambling (Ill. Rev. Stat. 1989, ch. 38, pars. 28—1.1(d), 28—3, 28—1(a)(11), 8—2(a)). The grand jury indicted DeLaire with conspiracy to commit gambling and syndicated gambling. Other than the testimony regarding the actual breaking into Rippin's residence, the trial court heard no evidence. It relied on the face of the complaint for the

search warrant, the seven subpoenas *duces tecum*, an affidavit from the keeper of records at the telephone company, and the prosecutor's admissions.

On November 11, 1989, Detective David Wall of the Addison police department swore the allegations of the complaint for the search warrant. According to the complaint, on September 14, 1989, he received a telephone call from a woman who wished to remain anonymous. She claimed her husband was placing bets with Donald Rippin on the outcome of sporting events. Her husband would telephone Rippin's paging number, and Rippin would then call him. She told Wall the numbers. She also stated that Rippin worked for a man called "Fast Eddy." The caller gave Rippin's address and said he lived there with his girlfriend, "Toots." The tipstrix gave Toots' telephone number.

Wall checked the telephone number and determined that it was registered to Bernice Bauer at the address provided by the tipstrix. He went to the address and saw a car registered to Bauer and a pickup truck registered to a Donald Rippin of that address. On October 7, 18, and 28, Wall followed Rippin as he drove to DeLaire's house in Villa Park. On October 14, Wall saw Rippin meet briefly with two men in cars. Wall checked their license plate numbers with the Secretary of State and determined they were registered to people with addresses in Hanover Park and Elmhurst. Wall and other detectives also conducted surveillance on Rippin's residence and noticed that he did not leave his location during the hours they suspected he was accepting wagers, namely, Saturday, October 21, 1989, 7:30 a.m. to 12 p.m.; Sunday, October 22 from 9:09 a.m. until 3:34 p.m.; and Monday, October 23 from 5:45 p.m. until 8 p.m. On the Sunday, Wall followed Rippin to a trailer home in Bartlett; Rippin drove a circuitous route, made a U-turn, and doubled back before entering the trailer.

These facts comprised the first two of the eight pages of the complaint for the search warrant. The trial court ruled that these facts alone were not sufficient to justify a search of the defendants' residences. The trial court ruled that the facts which follow did create probable cause to believe the defendants were committing gambling crimes; however, because these facts show Wall improperly relied upon the grand jury's MUD records, the trial court considered the evidence tainted and suppressed the evidence discovered during the execution of the warrant.

In his complaint, Wall next stated he reviewed the MUD records, but he did not reveal how he obtained them. The MUD records

showed the numbers of all the telephone calls that originated from Rippin's Addison residence from October 20 through 24 and the duration of the calls. On October 21, 1989, that phone originated 44 calls from 10 a.m. to 6:35 p.m., and most calls lasted less than a minute. The phone originated three calls to a number which Wall, upon further inquiry, determined was registered to the Hanover Park man. The phone also originated seven calls to another number, which Wall determined was owned by Score Board, Inc. Wall called that number and heard a recording of the scores of various sporting events.

Wall reviewed the MUD records for the Bartlett trailer from Sunday, October 22. The telephone there originated 70 calls before 3 p.m. The calls were of short duration, often less than a minute. Some of the calls were to numbers Wall determined were registered to the men with the addresses in Hanover Park and Elmhurst with whom Rippin had met the prior week.

Wall determined that the Chicago Bears football team played a game on Monday evening, October 23. From 4:45 to 7:02 p.m., 48 calls were placed from the phone in Rippin's Addison residence. The first and last calls were made to a number Wall later determined was registered to DeLaire.

Wall conducted a similar surveillance and MUD record study for Sunday, October 29, during which Rippin did not leave the residence. At the residence in Addison, 81 calls were placed between 9:55 a.m. and 3:10 p.m., including five to DeLaire's number and seven to Score Board, Inc. A similar pattern was shown on other dates. Wall checked the MUD records for DeLaire's address and found several calls from Rippin's address and several to Score Board, Inc. The records also showed a call to a different number, which Detective Simo called. The man who answered the call said that he provided sports information, such as the "Line," to paid subscribers and that his address was in Las Vegas, Nevada.

Wall spoke with a sergeant from the Illinois State Police who said that Rippin and DeLaire were convicted of syndicated gambling in Du Page County in May 1986 and were coconspirators. The sergeant also said DeLaire used the name "Fast Eddy." Wall spoke with a sergeant of the Du Page County sheriff's office, who related that he observed DeLaire accepting bets over the telephone in a bar where he would make payments to patrons. On November 11, Sergeant Gorniak of the Addison police department followed DeLaire to a lounge in Lombard. The public phone rang six times, and DeLaire answered each call. Two calls were for other patrons. During the other four calls, DeLaire spoke less than a minute. He also wore a pager.

Wall concluded that, based on his experience, the defendants' behavior was consistent with the *modus operandi* of men running a wire room. In his experience, telephone calls used to place wagers are very short in duration. He concluded that they were accepting bets on Saturday collegiate and Sunday and Monday professional football games.

The judge granted the search warrant, which the police executed on November 12. Wall broke down Rippin's door with a battering ram and caught him with a telephone in his hand. The police seized currency, four envelopes, including one containing water-soluble paper, three football line sheets, an envelope containing gambling records, ripped gambling records, records of the status of the accounts of the bettors, other records and two pagers.

The defendants brought a motion to suppress the evidence. They introduced an affidavit of the keeper of records at Illinois Bell Telephone Company (Bell). She stated that Bell will produce MUD records to law enforcement officials only when they supply a subpoena. The records will be mailed to a subscriber upon his request.

During Wall's investigation, the clerk of the circuit court for Du Page County had issued seven subpoenas *duces tecum* to the sheriff to serve on Bell. The subpoenas required Bell to appear before the grand jury on a specified date with the specified MUD records. The State's Attorney's name appeared on the bottom of the subpoenas. The return showing service of the subpoena was left blank on all but the first and last subpoena. Instead, the others bear an unsigned notation such as "sent by regular mail 10-16-89." Some bear a notation that the sending of the subpoena was only a confirmation of a previous oral request. The November 6 subpoena, requiring an appearance on November 8, was mailed November 9, but it bore a note that it was only a confirmation of Wall's telephonic request.

The seventh subpoena was dated January 2, 1990, and commanded an appearance on January 17, 1990. These dates followed the indictment. The first subpoena was dated September 21, 1989, but it sought only the basic subscriber information for the Addison address. The other subpoenas were issued October 16, 19, 26, 31, and November 6, 1989. They commanded Bell's appearance with the records before the grand jury on November 8 and 10. However, the complaint for the search warrant reveals that Detective Wall used the MUD records prior to the grand jury sessions. He used the information to discover additional information that the defendants were engaged in gambling; for example, his investigations showed some of the numbers revealed in the MUD records were sports information services. The trial court also took notice that the State's Attorney had a stand-

ard practice of obtaining a court order at the beginning of every grand jury session permitting him to obtain subpoenas without the specific authorization of the jury.

The trial court made several rulings. First, after a careful weighing of the evidence, the court determined the defendant failed to disprove that the police had knocked and announced prior to their breaking of Rippin's door. Second, the complaint for the search warrant demonstrated probable cause to justify the issuance of the warrant but not without the evidence obtained from the MUD records. Third, the defendants had a privacy interest in the MUD records. Fourth, the grand jury could nonetheless subpoena the MUD records because the records were relevant and the request was not overly broad. Fifth, the seventh subpoena was improper because it was sent after the indictment and the grand jury had finished its investigation. Sixth, whether the subpoenas were sent by regular mail and facsimile to the telephone company or were personally served did not make a difference to the defendants' motion. Seventh, the diversion of the MUD records from the grand jury to Wall was illegal, and the evidence obtained through the use of the produced MUD records was suppressed.

## II

The State argues that there is no privacy interest in MUD records and that the grand jury was statutorily authorized to release the information to the government investigators.

Because the Illinois Constitution of 1970 exceeds the Federal constitutional guarantees of privacy (*In re May 1991 Will County Grand Jury* (1992), 152 Ill. 2d 381, 390) (hereinafter *Marquez*), we quote it in full.

> "The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. 1, §6.

The State argues that citizens have no right of privacy in the MUD records. Without a right of privacy, the State's use of the records does not violate the constitutional provisions. (*People v. Jackson* (1983), 116 Ill. App. 3d 430, 432.) The State cites *United States v. Miller* (1976), 425 U.S. 435, 48 L. Ed. 2d 71, 96 S. Ct. 1619, in which the United States Supreme Court ruled that a defendant had no pri-

vacy interest in the business records kept by a third party, a bank. There was no expectation of privacy in the contents of negotiable instruments used in commercial transactions. The State also cites *Smith v. Maryland* (1979), 442 U.S. 735, 61 L. Ed. 2d 220, 99 S. Ct. 2577, in which the Supreme Court ruled that the use of a pen register did not constitute a search since a defendant did not have a legitimate expectation of privacy in the numbers dialed. In *Smith*, the police had the telephone company install a pen register, which is a device which records the numbers dialed from a telephone, but it did not record the contents of the conversations.

■ We believe that citizens have a legitimate expectation that their telephone records will not be disclosed. (See *Katz v. United States* (1967), 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (defining legitimate expectation of privacy and holding that privacy interest in a public telephone booth prohibited interception of calls placing wagers).) *Miller* and *Smith* are not controlling because the Illinois Constitution provides greater protection than the Federal Constitution. (*Jackson*, 116 Ill. App. 3d at 434; see *Marquez*, 152 Ill. 2d at 390; see also *United States v. Illinois Bell Telephone Co.* (7th Cir. 1976), 531 F.2d 809, 814-15 (involving probable cause to install pen register during gambling investigation).) Moreover, *Miller* involved items which were voluntarily delivered to the third parties. Bell is a monopoly and a utility, and it records customers' message unit details automatically and involuntarily. As in *Jackson*, the MUD records revealed personal associations and dealings which create a "biography" which should not be subject to an unreasonable search or seizure. (*Jackson*, 116 Ill. App. 3d at 435.) The MUD records disclosed highly personal matters similar to banking records (as in *Jackson*), credit services, and income tax services. (See *Small v. Kusper* (1987), 161 Ill. App. 3d 42, 47.) In *United States v. Karo* (1984), 468 U.S. 705, 715-16, 82 L. Ed. 2d 530, 541-42, 104 S. Ct. 3296, 3303-04, the Supreme Court determined that the police could not monitor activities in a home with an electronic device; it revealed critical facts about the activities in the interior of a residence. Similarly, the MUD records constituted a monitor of the activities in defendants' residences. In addition, the MUD records indicate whether calls are completed and their duration, which the pen-register monitoring in *Smith* did not do. The evidence before the trial court, which admitted it was familiar with MUD records, supports its conclusion that the records were private. Although Bell also has access to the records, that does not negate persons' expectation of privacy in the telephone records. (See 1 W. LaFave, Search & Seizure §2.7(b), at 508 (2d ed. 1987).) Thus, we affirm the trial court's finding

concerning the privacy interest in MUD records. See Annot., 76 A.L.R.4th 536 (1990) (cited by trial court regarding privacy interest in telephone records); see also *State v. Gunwall* (1986), 106 Wash. 2d 54, 720 P.2d 808.

## III

■■ ■ While the defendants had a privacy interest in their telephone records, the grand jury could nonetheless obtain those records even without probable cause. The grand jury occupies a unique role in our criminal justice system. It is an investigatory body charged with the responsibility of determining whether probable cause that a crime has occurred exists. The grand jury can investigate merely on a suspicion that the law is being violated or even just because it wants assurance that it is not. (*United States v. R. Enterprises, Inc.* (1991), 498 U.S. 292, 297, 112 L. Ed. 2d 795, 805, 111 S. Ct. 722, 726.) A grand jury investigation is not completed until every available clue has been tracked and all witnesses examined to determine whether a crime has been committed. (*United States v. R. Enterprises, Inc.* (1991), 498 U.S. 292, 297, 112 L. Ed. 2d 795, 805, 111 S. Ct. 722, 726.) The State is not required to justify the issuance of a subpoena by establishing probable cause because the very purpose of the request is to ascertain whether probable cause exists. (*United States v. R. Enterprises, Inc.* (1991), 498 U.S. 292, 297, 112 L. Ed. 2d 795, 805, 111 S. Ct. 722, 726; see *Marquez*, 152 Ill. 2d at 392.) The grand jury is unrestrained by technical and evidentiary rules governing the conduct of criminal trials which would burden it with minitrials on evidence. (*R. Enterprises*, 498 U.S. at 298-99, 112 L. Ed. 2d at 806, 111 S. Ct. at 727.) Thus, a grand jury may subpoena private documents even without having probable cause to believe the owner has committed a crime. A respondent's turnover of documents pursuant to a subpoena is less intrusive than a seizure of documents, and the respondent of a subpoena has the opportunity to quash it before complying. These aspects also diminish the need for a showing of prior probable cause. 2 W. LaFave, Search & Seizure §4.13(e), at 382 (2d ed. 1987).

The grand jury's subpoena power is not unlimited, however. When it infringes on a person's protected rights, the reasonableness of the intrusion must be tested against the validity of the grand jury's subpoena. (*Marquez*, 152 Ill. 2d at 392; *People v. I.W.I., Inc.* (1988), 176 Ill. App. 3d 951, 956-57.) MUD records are documentary evidence rather than personal or bodily evidence (*cf. Marquez*, 152 Ill. 2d at 394-400 (hair samples)), and the reasonableness of the intrusion is tested by determining (1) whether the document is relevant to the in-

quiry; and (2) whether the specification of the document to be produced is adequate but not excessive for the purpose of the relevant inquiry (*Jackson*, 116 Ill. App. 3d at 436). The defendants make no argument that the trial court erred by finding that the MUD records were relevant and specified. We also find no error and find the grand jury could validly subpoena the MUD records. See *People v. Allen* (1951), 410 Ill. 508, 516-18 (relevancy of documents showing conspiracy to commit gambling).

## IV

We next address the critical issue in this cause, the suppression of the evidence discovered during the execution of the search warrant. We note that the trial court did not quash the indictment. The exclusionary rule does not bar a grand jury from considering evidence illegally obtained, and the use of such evidence does not warrant dismissal of an indictment. (*United States v. Calandra* (1974), 414 U.S. 338, 343-45, 38 L. Ed. 2d 561, 568-69, 94 S. Ct. 613, 617-18; *People v. J.H.* (1990), 136 Ill. 2d 1, 11.) The trial court has the authority to dismiss an indictment procured through prosecutorial misconduct only when the accused can show that the misconduct results in actual and substantial prejudice to him. (*People v. Fassler* (1992), 153 Ill. 2d 49, 58.) While the grand jury may consider improper evidence, the trial court may suppress the use of the evidence during a criminal trial. *J.H.*, 136 Ill. 2d at 11.

The trial court's holding rests on the finding that it was the police department, not the grand jury, which used the MUD records. The trial court found that the State's use of the subpoena to obtain information to support a search warrant was improper because the police officer was not acting as the agent of the jury. Wall could not have obtained the MUD records by himself because the facts he knew would not have supported probable cause for a seizure of the records. The court found such a diversion of records would be "watering down the warrant requirement tremendously" and would render the constitutional protections meaningless. The police could circumvent the probable cause requirement in any instance merely by diverting information obtained by a subpoena. The trial court determined the grand jury information could not be disclosed to the police for the purpose of police work but only for grand jury work. The police illegally obtained the private information listed in the complaint for the search warrant, and the evidence could not be used at a criminal trial.

■ The trial court's reasoning has support in the law. The prosecutor or police may not usurp the powers of the grand jury.

"The subpoena power of the grand jury is designed for its own use, not to further independent investigations of the prosecutor or police. In most jurisdictions, the prosecutor may have subpoenas issued without advance authorization of the grand jury, but the purpose of the subpoena must be to produce evidence for use of the grand jury." (1 W. LaFave & J. Israel, Criminal Procedure §8.8, at 665 (1984).)

The prosecutor may screen the materials prior to the presentation to the jurors, but he may not use the subpoena as a ruse to obtain information. 1 W. LaFave & J. Israel, Criminal Procedure §8.8, at 665-66 (1984).

The purpose of the grand jury requires that it remain free, within constitutional and statutory limits, to operate independently of either the prosecuting attorney or judge. (*United States v. Sells Engineering, Inc.* (1983), 463 U.S. 418, 430, 77 L. Ed. 2d 743, 756, 103 S. Ct. 3133, 3141.) The grand jury must operate in secrecy. (*R. Enterprises*, 498 U.S. at 299, 112 L. Ed. 2d at 806, 111 S. Ct. at 727.) Ordinarily, matters of the grand jury may not be disclosed by the State's Attorney. (Ill. Rev. Stat. 1989, ch. 38, par. 112—6.) A savings of time cannot justify a breach of security. *Sells Engineering*, 463 U.S. at 431, 77 L. Ed. 2d at 757, 103 S. Ct. at 3141-42.

The constitution, statutes, and the case law recognize the primary and nearly exclusive role of the grand jury as the institution of compulsory disclosure. The law does not recognize the State's Attorney's office as a proper substitute for the grand jury room, and the law does not recognize the use of a grand jury subpoena as a compulsory administrative process of the State's Attorney's office. (*In re Melvin* (1st Cir. 1976), 546 F.2d 1, 5.) The grand jury is the sword and the shield of the citizenry. (See *People v. Rodgers* (1982), 92 Ill. 2d 283, 289; 1 W. LaFave & J. Israel, Criminal Procedure §8.1, at 599 (1984).) Grand jury secrecy is as important for the protection of the innocent as for the pursuit of the guilty. (*Sells Engineering*, 463 U.S. at 424, 77 L. Ed. 2d at 753, 103 S. Ct. at 3138; *Rodgers*, 92 Ill. 2d at 288-90.) Its powers cannot be used to circumvent the protections of the fourth amendment. (See *In re Nwamu* (S.D.N.Y. 1976), 421 F. Supp. 1361 (subpoena to deliver documents to agent "forthwith" is an improper encroachment on the fourth amendment).) Grand juries are subject to judicial control and the limits of the Bill of Rights. (*United States v. Dionisio* (1973), 410 U.S. 1, 12, 35 L. Ed. 2d 67, 78, 93 S. Ct. 764, 770.) The use of a subpoena is a judicial process, and the courts have broad powers to prevent abuses of their processes. (*People v. Walley*

(1991), 215 Ill. App. 3d 971, 974.) The trial court could thus suppress the resulting evidence. 215 Ill. App. 3d at 975.

█ █ █ Our analysis is not complete because the subpoena was initially valid under the grand jury's powers as an inquisition. (See *J.H.*, 136 Ill. 2d at 14.) The State notes that pursuant to section 112—6(c)(1) of the Code of Criminal Procedure of 1963 (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 112—6(c)(1)(b)), the grand jury may make disclosures to the State's Attorney for use in the performance of his duties and to "such government personnel as are deemed necessary by the State's Attorney in the performance of such State's Attorney's duty to enforce State criminal law." (See also Ill. Rev. Stat. 1989, ch. 34, par. 3—9005 (duties of State's Attorneys).) Section 112—6(c) is necessary because ordinarily only one or two prosecutors will appear before the grand jury, but the whole "prosecution team" may need to use the discovered information. (1 W. LaFave & J. Israel, Criminal Procedure §8.5(d), at 632-33 (1984), citing *Sells Engineering*, 463 U.S. 418, 77 L. Ed. 2d 743, 103 S. Ct. 3133.) Such provisions also enable the State's Attorney to refer evidence to experts for analysis of chemical composition, fingerprints, accounts, or handwriting, for example. See *Sells Engineering*, 463 U.S. at 436, 77 L. Ed. 2d at 760, 103 S. Ct. at 3144.

As the trial court found, the State has made no showing that Detective Wall was acting in the performance of the duties of the State's Attorney or the grand jury. (See *People v. Corr* (Colo. 1984), 682 P.2d 20, 29-30.) The record shows no hint of the involvement of the State's Attorney in procuring the search warrant and no involvement of the grand jury in any part of the investigation. Moreover, section 112—6(c)(2) of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 112—6(c)(2)) further explains that any person to whom matters are disclosed shall not use the grand jury material for any purpose other than assisting the State's Attorney in the performance of the State's Attorney's duty to enforce State criminal law. Importantly, section 112—6(c)(2) requires the State's Attorney to inform promptly the court of all such persons receiving disclosure. The State cannot claim the benefit of disclosure under section 112—6(c)(1) without having shown compliance with section 112—6(c)(2) by informing the court of the disclosure.

We are cognizant of Detective Wall's performance because the MUD records by themselves were of limited value in reaching probable cause. Detective Wall enhanced the value with his diligent follow-up research. The bare numbers on the documents did not tell a story. Wall's further investigation showed these numbers were registered to DeLaire, Score Board, Inc., the Las Vegas line, and customers. He

also applied his knowledge of the pattern of calls and the times of the calls to link the calls to the sports wire room *modus operandi,* although he never explained on what he based his experience of gambling patterns. The grand jury could not very well conduct surveillance outside Rippin's residence during the prime wagering periods or watch DeLaire take calls in a lounge. Complex grand jury investigations require the coordination of the prosecutors and other government agents. (See 8 J. Moore, Federal Practice §6.01[9], at 6-29 (2d ed. 1992).) It is the grand jury which conducts the investigation. In the Federal practice, the names of all those to whom information has been disclosed must be promptly provided to the court. This requirement assures that all personnel involved in the investigation comprehend and appreciate the secrecy of the grand jury proceedings. (8 J. Moore, Federal Practice §6.01[9], at 6-30 (2d ed. 1992); see *In re Kiefaber* (9th Cir. 1985), 774 F.2d 969, 974-75.) Section 112—6(c) of our Code now requires such disclosure; it was enacted after our opinion in *Board of Education, Community Unit School District No. 200 v. Verisario* (1986), 143 Ill. App. 3d 1000, and is nearly identical to Federal Rule of Criminal Procedure 6(e)(3) (Fed. R. Crim. P. 6(e)(3)). In *Verisario,* we ruled the Federal law was instructive in construing an identical State provision. (*Verisario,* 143 Ill. App. 3d at 1005.) Wall's complaint demonstrates he was not acting as an investigator of the grand jury or of the State's Attorney with an appreciation of their powers and duties as section 112—6(c)(2) requires.

In this situation, the State's Attorney should have requested the grand jury to petition the circuit court to appoint Wall as its investigator pursuant to section 112—5 of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 112—5). The trial court found, however, that Wall was not acting as the agent of the grand jury. (*Cf. United States v. Dionisio* (1973), 410 U.S. 1, 35 L. Ed. 2d 67, 93 S. Ct. 764 (FBI agent appointed as the grand jury's investigator to examine gambling records; it was the grand jury which was conducting the investigation).) The Code provided the needed procedures which the State failed to use. Given the State's Attorney's lack of involvement and the failure of the grand jury to receive the subpoenaed records, we are not surprised by the the lack of compliance with either section 112—5 or 112—6(c)(2), which would have permitted Wall to act as the agent of the jury or of the State's Attorney. Detective Wall was conducting his own investigation with the subpoena powers of the grand jury but without the protections built into the grand jury system. Wall was not appointed as the investigator of the grand jury, and the content of the subpoenaed records could not be divulged to him. Thus, the informa-

tion supporting his complaint for a search warrant was obtained illegally, and the trial court properly suppressed the fruits of the search. (See *Walley*, 215 Ill. App. 3d at 974-75.) We agree with the trial court that the device of the subpoena *duces tecum* cannot be used to circumvent the warrant requirement of the Federal and State constitutions by investigators who are not the appointed agents of a grand jury and thus under the control of the independent citizens and the court.

The State argues that the secrecy of the grand jury applies only to prevent disclosure of the essence of what transpires within the jury room and not the documents sent to the jury. (*Board of Education, Community Unit School District No. 200 v. Verisario* (1986), 143 Ill. App. 3d 1000, 1007.) In *Verisario*, this court ruled that the grand jury secrecy did not prevent documents such as telephone records, which the grand jury had subpoenaed, from being later used in other causes. The mere fact that the grand jury has viewed a document did not convert it into a matter occurring before a grand jury. (143 Ill. App. 3d at 1007-08.) However, in *Verisario*, the grand jury had used the documents to indict the defendant, and a criminal trial had ensued; the plaintiff in a later civil suit subpoenaed the defendant's documents from the police department. The text of the documents by itself did not reveal anything of the grand jury proceedings.

By contrast, the situation before this court involves an action by the State to obtain records over which the defendants had a legitimate expectation of privacy and which had not been made public at a prior trial. The police circumvented the fourth amendment by diverting private records from the secret grand jury. In *Verisario*, we adopted the reasoning of the Supreme Court in *Sells Engineering*, which held that information secured by grand jury subpoenas could not be routinely distributed to other criminal and civil government attorneys. (143 Ill. App. 3d at 1005.) We noted the *Sells Engineering* concerns that such disclosure would increase the risk of inadvertent or illegal release of grand jury materials to others; would further tempt prosecutors to manipulate the grand jury to elicit improperly evidence for use in civil cases; and would threaten to subvert discovery limitations applied outside the grand jury context. (143 Ill. App. 3d at 1005-06, citing *Sells*, 463 U.S. at 431-35, 77 L. Ed. 2d at 757-59, 103 S. Ct. at 3142-44.) In this cause, the State violated the fourth amendment by obtaining private records through the misuse of the subpoena power of the grand jury. This power is an extraordinary grant which is intended only for use by a group of citizens protected by secrecy. See 8 J. Moore, Federal Practice §6.01[9], at 6-29, 6-30 (2d ed. 1992).

## V

■ Finally, the State argues that even without the MUD records, the State established probable cause based on an anonymous tip, the prior criminal history of the defendants, and the conversations with other officers regarding the defendants' involvement with gambling. A reviewing court will not reverse a trial court's ruling on a motion to suppress unless the ruling is against the manifest weight of the evidence. (*People v. Galvin* (1989), 127 Ill. 2d 153, 162; *People v. Galdine* (1991), 212 Ill. App. 3d 472, 478-79.) The trial court specifically ruled that the complaint without the MUD record allegations was insufficient to establish probable cause. Stripped of the MUD record evidence, the complaint established only that two men who were convicted of gambling in the past lived where the tipstrix said they lived and that they answered public phones in a bar. Nothing else they did was suspicious enough or out of the ordinary to rise to the level of probable cause. (*People v. Adams* (1989), 131 Ill. 2d 387, 397-400.) The trial court's finding was not manifestly erroneous.

## VI

■ The defendants also maintain that the State violated section 7 of the Telegraph Act (Ill. Rev. Stat. 1989, ch. 134, par. 7) and section 108A—3 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 108A—3). These statutes are not relevant to the situation before the court. The State did not obtain the content of conversations or telegrams. Thus the statutes do not expand the protection provided by section 6 of the Illinois Bill of Rights. Section 6 of the Bill of Rights was not intended to be coextensive with the eavesdropping statute, but open-ended to include all means of intercepting communications, including "Buck Rogers devices." (6 Record of Proceedings, Sixth Illinois Constitutional Convention 1525-27 (1970).) Moreover, the confidentiality imposed by these statutes would not prevent the use of a grand jury subpoena to obtain written records in the hands of third parties. (See *People v. Jackson*, 116 Ill. App. 3d at 436-37 (concerning bank confidentiality statutes).) At most, these statutes demonstrate the public policy that the messages conveyed by utilities be kept confidential. The statutes are, however, not necessary to our determination.

## VII

■ Defendant Rippin also argues that the police officers failed to knock and announce their presence before breaking his door. (See

*People v. Condon* (1992), 148 Ill. 2d 96, 102-03; *People v. Saechao* (1989), 129 Ill. 2d 522, 530.) It is unlikely that Rippin would have continued to take wagers and would have failed to destroy his records if the officers had announced their presence at his door. The officers were aware that gamblers write their wagers on water soluble or flash paper which can be destroyed in an instant. Nevertheless, the trial court heard two witnesses testify that the police did announce their presence, and the trial court believed the officers. The trial court has the duty of assessing the credibility of the witnesses and the weight to be given their testimony. (*Galvin*, 127 Ill. 2d at 163.) In this cause, the trial court gave a lengthy and careful explanation of the facts supporting its finding. The trial court's ruling that the police gave all the necessary warnings is not against the manifest weight of the evidence. See *Condon*, 148 Ill. 2d at 101; see also *People v. Caruso* (1971), 2 Ill. App. 3d 80, 81-82 (destructibility of gambling records).

## VIII

Defendants also argue that the subpoenas were not valid because they were not properly served. Section 155—2 of the Code (Ill. Rev. Stat. 1991, ch. 38, par. 155—2) provides that the sheriff or coroner will serve the subpoena. Supreme Court Rule 204 (134 Ill. 2d R. 204) allows the service of a subpoena by certified mail with a return receipt. An unknown person served Bell by regular mail or facsimile with five of the subpoenas. Defendants argue that this deficiency renders them invalid.

The trial court did not agree with this argument. The defendants do not have standing to object to the sufficiency of service. Bell could challenge the subpoena because Bell would be subject to contempt sanctions for failure to obey the process. Bell, however, was not concerned with the mode of service and allegedly complied with the subpoena, even though the subpoenas did not state that compliance would be deemed sufficient by delivering the documents to an authorized agent. The defendants could not be held in contempt for challenging the subpoenas, and they have no standing to contest the service. Although the defendants cite *People v. Henderson* (1971), 133 Ill. App. 2d 336, in that case the defense counsel served the subpoenas on the witnesses. Since the sheriff had not served the witnesses, the defendant could not compel their attendance. In the cause before the court, the defendants' rights are those concerning the privacy of the MUD records; the defendants have shown no right to have a third party served by a sheriff. The third party has the right to contest the

effectiveness of the court's jurisdiction over it based on an improperly served subpoena. At most, the informal service reflects the laxity of the procedures used by the State throughout the investigation. Although the defendants do not raise the issue, we find the failure to complete the return of service is also a serious lapse of procedure. The failure could prevent litigants from tracing the flow of information from confidential sources to unknown agents of grand juries.

## IX

The trial court did suppress the evidence produced by the seventh subpoena. The subpoena compelled the production of the MUD records for October 26 through 30, 1989. Although the subpoena does bear a return of service, it bears a note that the subpoena was a confirmation only of records requested by Wall on October 30. The subpoena was issued on January 2, 1990, delivered January 5, and returnable before the January 17 grand jury. The grand jury had already indicted the defendants on December 1, 1989. Wall's November 11 complaint utilized the October 26 through 30 MUD records.

The defendants argue that a post-indictment grand jury subpoena is invalid because a grand jury subpoena may not be used for discovery in criminal cases. Once the defendant has been indicted, the State is precluded from using the grand jury for the sole or dominant purpose of obtaining additional information against him. (*United States v. Thompson* (7th Cir. 1991), 944 F.2d 1331, 1337.) Where the investigation focuses on the facts already covered by the indictment, the subpoena must be quashed because the inquiry of the grand jury has ended. Without the extraordinary purpose of the grand jury, the State lacks the reason behind the relaxation of the fourth amendment protections overridden by a subpoena. After the indictment, the State must comply with ordinary discovery means.

Although we have found no Illinois authority regarding grand jury subpoenas used for discovery during a pending case, we have recently issued several opinions regarding the State's misuse of subpoenas for discovery in criminal cases. In *People v. Hart* (1990), 194 Ill. App. 3d 997, the State issued 41 subpoenas *duces tecum* to various health care providers. The subpoenas directed the respondents to deliver their documents to the State's Attorney as an alternative to appearing before the trial court; however, no proceedings were actually conducted on the court date. This extrajudicial delivery and inspection was in clear violation of law, which required the materials to be reviewed by a judge before being disclosed to the State. (194 Ill. App. 3d at 1002.) The defendant had no opportunity to contest the issuance of the sub-

poenas either before the issuance or when the subpoenas were returnable. Thus, the trial court properly suppressed the records subpoenas. Similarly, in *People v. Walley* (1991), 215 Ill. App. 3d 971, 975, we affirmed the suppression of a subpoena *duces tecum* where it was issued for a date when no hearing was scheduled. The opportunity to quash a subpoena is one of its most important aspects justifying the exception to the fourth amendment requirement of prior probable cause. 2 W. LaFave, Search & Seizure §4.13(e), at 382 (2d ed. 1987).

These cases show that the trial courts must be diligent to protect the overreaching of the State's use of the subpoena *duces tecum*. (See *People ex rel. Fisher v. Carey* (1979), 77 Ill. 2d 259, 270.) The seventh subpoena was improperly issued, and the trial court could suppress the resulting evidence. That the State obtained the evidence two months prior to the service is not relevant, because the State had the power to serve the subpoena in a timely manner, but it chose not to do so. The State considers the receipt of the MUD records as a *fait accompli*. Thus, its laxity in complying with the due process requirements has returned to haunt it, because the evidence could have been used by the grand jury had the subpoena been timely and properly served. When the State attempts to use material covered by a privacy interest, the State must show its right to use it. The State has failed to demonstrate it had a valid possession of the information.

Because we have affirmed the suppression of the search warrant, we do not address the defendants' final issue that the warrant was insufficiently descriptive of the items to be seized.

For the above reasons, the order of the circuit court of Du Page County is affirmed.

Affirmed.

GEIGER and DOYLE, JJ., concur.