THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KEITH P. MARTINI, Defendant-Appellant.

Second District    No. 2—92—0873

Opinion filed July 29, 1994.

George P. Lynch, of George Patrick Lynch, Ltd., of Downers Grove, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers, Lisa A. Hoffman, Robert J. Biderman, and James L. Overholt, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:
Defendant, Keith Martini, was found guilty by a jury of one count

of unlawful delivery of a controlled substance in violation of section 401(a)(7)(D) of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1991, ch. 56¹/₂, par. 1401(a)(7)(D) (now 720 ILCS 570/401(a)(7)(D) (West 1992))) in the form of more than 1,500 objects or segregated parts of an object containing lysergic acid diethylamide (LSD). The defendant was sentenced to serve a term of 20 years and fined $5,000. On appeal, defendant raises three issues, although we only address one in this published opinion: defendant challenges the constitutionality of the issuance and execution of an "anticipatory" search warrant on the basis that there was a violation of his right against unreasonable searches and seizures and his right to privacy under the Illinois and the United States Constitutions. We affirm.

The following facts emerged from testimony at trial and the complaint for a search warrant. Officer John Bright was assigned to the Du Page Metropolitan Enforcement Group (DuMEG). Bright was introduced to Michael Adams at a McDonald's restaurant in Villa Park, and purchased drugs from him in an undercover capacity in November 1991. Bright also dealt with Adams' friend, John Okkema. One transaction that occurred between Bright, Adams, and Okkema was on December 5, 1991, for 300 doses of LSD. The drug was delivered in the form of a sheet of perforated blotter paper consisting of numerous squares impregnated with the drug. Each three-eighth-inch square, with a print of an "Egyptian" eyeball on it, was one dose.

Bright next negotiated with Adams for the purchase of 50 sheets, or 5,000 doses of LSD, but Adams told Bright he would have to check with his source about it. When Adams told Bright that he would only be able to obtain 27 sheets from his source, Bright stated that he wanted to purchase all 27 sheets. At about 4 p.m. on December 11, 1991, Bright spoke with Adams on the phone and arranged to meet him that evening at a McDonald's restaurant. Around 7:45 p.m. that evening in the parking lot of McDonald's, Adams entered Bright's pickup truck. Adams had delivered to Bright the first delivery of the 27-sheet transaction. The delivery consisted of a plastic bag containing 1,000 doses of LSD on perforated paper, and Bright paid Adams $1,500 in cash. Adams exited the truck and went to Okkema's car. Bright also left the truck and went back to Officer O'Brien's vehicle, which was parked in the McDonald's lot. Each officer then performed a field test on one of the segments of LSD-impregnated paper that Adams had delivered to Bright. Both field tests were positive. O'Brien took the 998 remaining doses of LSD and Bright returned to his truck, taking $2,500 in cash.

Adams and Okkema joined Bright in his truck, and it was agreed

that they would take Bright to the general area of their source to obtain the rest of the LSD. To that end, the three men drove to the vicinity of 315 Princeton Street, Villa Park, where they were observed by DuMEG surveillance agent Robert Swartz. Okkema asked Bright for additional money for the 1,700 doses that he was to acquire from the source. Bright refused to give him the money, so Okkema took the $1,500 Bright had given Adams for the initial 1,000 units, and exited the vehicle. Okkema entered apartment nine at the Princeton address. Within four minutes, Okkema returned to Bright's truck and handed Adams a manila envelope. Okkema stated that "Keith" had trusted him with the 17 sheets of LSD remaining in Keith's possession. The men drove back to McDonald's, where Adams handed Bright the LSD-impregnated paper, and Bright counted the sheets to be sure there were 1,700 units. Bright then removed the $2,500 from his pocket and at the same time tripped an electronic device to advise surveillance agents that the transaction was complete and that the arrest should take place. Altogether, Bright had purchased a total of 21.89 grams of LSD-impregnated blotter paper that night.

Both Adams and Okkema were arrested. At trial, on cross-examination, Bright admitted that neither Adams nor Okkema had been searched to see if they had drugs on them *before* Okkema went into the building at 315 Princeton, Villa Park. In addition, all of the quantities of LSD at issue could have easily fit into a person's pocket.

DuMEG agent Steven Dahl had been assigned to watch the apartment building located at 315 Princeton. The evening of the December 11, 1991, transaction, after Okkema, Adams, and Bright left the Princeton address to return to McDonald's, Dahl received Bright's signal and proceeded to execute the "anticipatory" search warrant at 315 Princeton. Dahl testified that another 76 doses of LSD were seized pursuant to the warrant as well as $1,450 in cash, 1 baggie of dried mushrooms, 7 baggies of cannabis, 1 film container of cannabis seeds, several pipes, and some ashtrays.

Dahl arrested the defendant and subsequently interviewed him. According to Dahl, defendant said that he had purchased 50 sheets of LSD in Minnesota and that the $1,450 found under a rug in the apartment was from tonight's deal. Dahl admitted on cross-examination that he did not know what happened in the apartment between Okkema and the defendant, and that it was possible that Okkema had the drugs in his possession at all times on December 11, 1991.

Defendant testified that he lived at 315 Princeton, apartment nine, in December 1991. He testified that he travelled regularly with

the Grateful Dead (hard-rock band) and, in order to support himself, he made tie-dyed shirts and sold spaghetti during the tour. He also admitted to ingesting drugs on the tour. In addition, he stated both he and Okkema, a friend of his, were "dead heads." Defendant denied selling LSD to Okkema on December 5, 1991, or December 11, 1991. He admitted that Okkema came over to his apartment from time to time; that Okkema came over on December 11, 1991, to return some tapes and he left $1,450 with defendant at that time; that Okkema "fronted" him 45 of the doses of LSD found in his apartment; and that he did not know Adams. Although he acknowledged that he was interviewed by Dahl after his arrest, defendant stated that he did not confess to Officer Dahl that he sold LSD to Okkema.

On review, the defendant challenges the trial court's denial of his pretrial motion to quash the search warrant. Defendant asserts that the "anticipatory" search warrant, its method of issuance, and its execution violated his constitutional rights against unreasonable searches and seizures. Defendant emphasizes that his right to privacy in the State of Illinois has a broader scope under article I, section 6, of the Illinois Constitution (Ill. Const. 1970, art. I, § 6) than an individual's expectation of privacy under the fourth amendment to the United States Constitution (U.S. Const., amend. IV). The State, on the other hand, asserts that an "anticipatory" warrant has been determined to be constitutional in other jurisdictions and should be so in Illinois as well. In addition, the State argues, the warrant in this case was executed only after all four conditions precedent were satisfied, thus it was executed properly. In the following analysis, we determine that "anticipatory" warrants are constitutional in Illinois, and the one at issue in this case was properly issued and executed.

The fourth amendment to the United States Constitution protects against unwarranted searches and seizures, and article I, section 6, of the Illinois Constitution sets forth a similar right. (U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6). That right has been referred to under the fourth amendment as existing within a "zone of privacy" (*United States v. Miller* (1976), 425 U.S. 435, 440, 48 L. Ed. 2d 71, 77, 96 S. Ct. 1619, 1622), or an "expectation of privacy" (*Miller*, 425 U.S. at 442, 48 L. Ed. 2d at 78-79, 96 S. Ct. at 1623; U.S. Const., amend. IV.) In Illinois, the right is referred to as the "zone of privacy," or "right to privacy" under article I, section 6, of the Illinois Constitution. *In re May 1991 Will County Grand Jury* (1992), 152 Ill. 2d 381, 392-93.

●1 Both the Illinois right to privacy and the United States right to be free from unreasonable police searches are protected through the process of the police securing search warrants. A police officer

secures a search warrant from a judge through presentation of an affidavit setting forth facts which the judge determines constitute probable cause to believe a criminal act has occurred or is about to occur. (*People v. Bak* (1970), 45 Ill. 2d 140.) In most instances, the document or affidavit will attest to the probable cause existing at the time the warrant is obtained and based on that, a search warrant will be issued by the court. An "anticipatory" search warrant is a warrant based upon an affidavit showing probable cause that at some future time, but not at the moment, certain evidence of a crime will be located at a specific place. (2 W. LaFave, Search & Seizure § 3.7(c), at 94 (2d ed. 1987).) There are exceptions to the need for a warrant, as in the case of "exigent circumstances," in which the police have reason to believe that an individual's well-being may be harmed if the police do not search a location immediately, in the absence of a warrant. *United States v. Karo* (1984), 468 U.S. 705, 717-18, 82 L. Ed. 2d 530, 542-43, 104 S. Ct. 3296, 3304-05.

The context in which an anticipatory warrant is usually employed is in a situation where the police have verified the existence of a mail delivery of drugs or contraband to a dealer. (2 W. LaFave, Search & Seizure § 3.7(c), at 94 (2d ed. 1987).) Since they are able to profess belief that probable cause will exist when the drugs are delivered to the dealer at a particular location, they are thus able to obtain a search warrant for the site of delivery to be executed at or following the time of delivery. The use of such a warrant serves the purpose of assuming that the fourth amendment right to freedom from unwarranted searches and seizures is served by allowing the police to obtain a warrant in *advance* of a delivery rather than relying on the exigent circumstances exception to the warrant requirement.

In the present case, Bright made some smaller transactions with Okkema and Adams, verified that the drug was being dealt by the source at 315 Princeton, apartment nine, verified by laboratory tests that Adams and Okkema were delivering LSD, and learned in discussion with Adams that his source would deal larger quantities of LSD. The officers at DuMEG were interested in arresting the source of the LSD, but the factual scenario set forth above arguably would not support an arrest warrant for the source. Instead, they set up a larger transaction with Adams, and obtained an "anticipatory" search warrant in expectation that a larger amount of drugs would be sold by the source out of the apartment. Such a search warrant, executed contemporaneously with the transaction, would likely permit the officers to arrest the dealer who was the source of the transactions. Indeed, it did in this case. Thus, due to the factual scenario of the present case, the "anticipatory" search warrant was employed.

A State may set a higher standard of rights than the comparable United States' constitutional right. (*Cooper v. California* (1967), 386 U.S. 58, 62, 17 L. Ed. 730, 734, 87 S. Ct. 788, 791.) The Illinois Supreme Court has determined that the privacy right conveyed by article I, section 6, of the Illinois Constitution offers a greater scope of protection against the invasion of privacy than does the fourth amendment to the United States Constitution. *In re May*, 152 Ill. 2d at 391; *People v. DeLaire* (1993), 240 Ill. App. 3d 1012, 1019; *People v. Jackson* (1983), 116 Ill. App. 3d 430, 434.

Defendant cites *People v. DeLaire* (1993), 240 Ill. App. 3d 1012, to illustrate the scope of the protection afforded by the Illinois constitutional right to privacy. At issue in *DeLaire* was the suppression of evidence gathered under a search warrant which utilized information obtained from Illinois Bell Telephone records (previously subpoenaed by the grand jury) to support the search warrant. While the phone records were properly used in the grand jury investigation, they were improperly used by a police officer conducting an investigation of unrelated gambling charges against defendant. The *DeLaire* court determined that the phone records of individuals in Illinois are protected by the Illinois constitutional right to privacy. (Ill. Const. 1970, art. I, § 6; *DeLaire*, 240 Ill. App. 3d at 1020-21.) Accordingly, the court determined that the police utilization of the phone records— records which had been obtained by a grand jury for another purpose—to establish probable cause for a search warrant in the gambling investigation was a breach of the defendant's constitutional right to privacy. (*DeLaire*, 240 Ill. App. 3d at 1022-23.) Thus, the appellate court upheld the trial court's suppression of evidence resulting from use of the defective search warrant. *DeLaire*, 240 Ill. App. 3d at 1023-24.

Defendant in the present case cites *DeLaire* to illustrate that the use of a defective search warrant may violate an individual's Illinois constitutional right to privacy. In the *DeLaire* case, the facts about the case that the police officer had otherwise ascertained would not constitute probable cause for him to legally seize the protected phone records. Therefore, the officer illegally used the phone records, which the grand jury had originally obtained, to establish probable cause to obtain a warrant. The warrant was issued to obtain evidence of gambling-related offenses, and on review the *DeLaire* court found such evidence properly suppressed. (*Delaire*, 240 Ill. App. 3d at 1024.) Defendant argues that *DeLaire*, in demonstrating that use of a defective search warrant violates a defendant's Illinois constitutional right to privacy, applies to the present case, in which the "anticipatory" search warrant never exhibited probable cause and so, it too, was defective.

Defendant contends that the "anticipatory" warrant failed to exhibit probable cause for two reasons: (1) all of the LSD-impregnated blotter paper was reportedly delivered to Bright in the transactions, so there would be no LSD left at the defendant's apartment, and thus no probable cause existed to search the defendant's apartment; and (2) according to the record, Bright did not document that the four conditions precedent had been met, and therefore no probable cause existed on the warrant before it was executed. We shall address the latter issue first.

•2 In the record we note an affidavit signed by Officer Bright dated December 13, 1991, which stated that all four conditions precedent had been satisfied in the transaction on December 11, 1991. Assuming the affidavit statements were correct, probable cause existed on December 11, 1991, before the search warrant was executed. An "anticipatory" warrant is one that has been issued before the necessary events have occurred which will allow a constitutional search of the premises, and when those events occur, the warrant is effective. (*United States v. Garcia* (2d Cir. 1989), 882 F.2d 699, 702.) As we will discuss below, our review of the record shows the conditions precedent were satisfied. The four conditions, when satisfied, established the following facts: (1) a transaction for LSD-impregnated blotter paper occurred in which Adams and Okkema sold Bright the drug-impregnated paper; and (2) the drug-impregnated paper was obtained when Okkema was observed entering apartment nine at 315 Princeton Street and emerging in possession of the envelope containing the blotter paper, and such blotter paper tested positive in the field test for LSD. We determine that such transaction for the illicit drug established the existence of probable cause.

•3 As regards defendant's other contention that no probable cause existed on the warrant because reportedly all of the LSD in defendant's possession was sold to Bright and therefore there was a belief that no LSD was on the premises, *the very fact* that LSD was sold to Bright gave rise to probable cause to support a search warrant. Search probable cause refers to the probability that a search will prove fruitful in yielding evidence of a crime. (*People v. Francisco* (1970), 44 Ill. 2d 373, 376.) It requires a showing of probability "that the items sought are in fact seizable by virtue of being connected with criminal activity, and that the items will be found in the place to be searched." (1 W. LaFave, Search & Seizure § 3.1(b), at 544-45 (2d ed. 1987).) In the present case, we determine that the police investigators adequately demonstrated that LSD came from apartment nine, 315 Princeton Street via Okkema and Adams and was sold to Bright. For these reasons, we determine that there was probable cause to support the warrant.

*People v. Galdine* (1991), 212 Ill. App. 3d 472, is an Illinois case that discussed in *dicta* the constitutionality of "anticipatory" warrants, although the court there did not *decide* whether they were constitutional in Illinois. In that case, the police set up a controlled buy of drugs, but did not obtain a warrant to search the location of the transaction. The *Galdine* court discussed "anticipatory" warrants because use of such a warrant would have been appropriate in the case. *Galdine* cited many foreign jurisdiction cases that found such warrants constitutional. (*Galdine*, 212 Ill. App. 3d at 480.) In addition, the *Galdine* court, citing a second circuit case, *United States v. Garcia* (882 F.2d 699), stated that "anticipatory" warrants may serve a useful purpose in that the fourth amendment right to freedom from unwarranted searches and seizures is better served by allowing the police to obtain a warrant in advance of a delivery, as the police do with an "anticipatory" warrant. In other words, the warrant is *issued* by a neutral court, in anticipation of the existence of probable cause, rather than having the police rely on the exigent circumstances exception to the warrant requirement to enter a building without a warrant. *Galdine*, 212 Ill. App. 3d at 481, citing *Garcia*, 882 F.2d at 703.

We note defendant's position that an "anticipatory" warrant should be used only if it is known by the police that there is contraband on the premises for which a warrant was issued. We do not read *Galdine* or the Federal cases dealing with anticipatory warrants so narrowly. In this case, while police did not know whether there was contraband at defendant's apartment, there was a likelihood of finding *other evidence* of the above-mentioned transactions than contraband at the defendant's apartment. Furthermore, the defendant's assertion that the police were required to know there was contraband at the apartment relies on some Federal case law we distinguish below.

There is language in the Federal case law on "anticipatory" warrants that is consistent with defendant's contention that there is no probable cause unless there is *contraband*, not merely *evidence* of a crime, but specifically *contraband* on the premises to be searched. (*Garcia*, 882 F.2d at 703; *United States v. Dornhofer* (4th Cir. 1988), 859 F.2d 1195, 1198; *United States v. Lowe* (6th Cir. 1978), 575 F.2d 1193, 1194.) Such language emerged from the majority of cases in which anticipatory warrants have been used. In those cases, a drug courier served as an informant to the police to aid in the arrest of a dealer who bought an illicit drug shipment from the courier. Typically, in those cases, the drug shipment in the hands of the courier/informant served to establish that *when* that shipment was

*delivered* to the dealer, probable cause to search would exist. Thus, the anticipatory warrant in those cases had as a condition precedent that the drug shipment had to be *at* the location to be searched nearly contemporaneous with the execution of the warrant.

Defendant in the present case points to such language to support his argument that since the police believed that no LSD would be *at* his apartment during the search, the police did not have probable cause to search the apartment. However, this premise is limited to controlled delivery cases such as those cited above. The present case presents a different factual scenario which should not be limited by the language in the Federal case law.

Furthermore, in the present case, it was not only contraband but other items from the transaction which were named in the complaint for warrant: cash, baggies, and controlled substances were all listed in the complaint for search warrant. Although the defendant asserts that all of the illicit drug was understood to be out of his apartment at the time of execution of the warrant, there was a likelihood of obtaining *other* items from that apartment related to the transactions, and for that reason the warrant was executed. Consequently, while Bright might have anticipated (wrongly) that he would not find more LSD in the apartment, he acted properly in searching for other evidence of the transactions. In sum, in the present case, probable cause existed when the conditions precedent were satisfied, and the "anticipatory" warrant documented that probable cause existed notwithstanding the absence of LSD in the defendant's apartment.

●4 For the foregoing reasons, we determine that "anticipatory" warrants in Illinois are constitutional, as was the warrant used in the present case. Such a warrant serves a useful purpose in protecting the right to privacy by requiring the police to get prior permission to enter and search from a neutral judge only if the conditions precedent will give rise to probable cause.

●5 Now we address the *issuance* of the search warrant in the present case. Officer Bright filed a complaint for search warrant on December 9, 1991, documenting several of his LSD transactions with Michael Adams and John Okkema during November and December 1991. During one of those transactions, Bright accompanied Adams and Okkema to 315 Princeton Street, apartment nine, where Okkema obtained perforated paper containing 300 doses of LSD which tested positive in laboratory tests. The details of this transaction were set forth in the complaint for search warrant. Upon filing this complaint, Bright was issued an "anticipatory" search warrant by a circuit court judge which imposed the following presearch conditions on Bright:

"1. that I meet with ADAMS or JOHN to discuss the transaction;

2. that ADAMS or JOHN go to 315 Princeton, Apt. #9, Villa Park, Illinois, to obtain the LSD after the meeting;

3. that ADAMS or JOHN meet me after leaving 315 Princeton, Apt. #9, and sell me sheets of perforated paper that appears to be LSD blotter paper;

4. that a field test is performed on the perforated paper, with a positive result for the presence of [LSD];

*THIS SEARCH WARRANT SHALL NOT BE EXECUTED UNLESS ALL OF THE ABOVE CONDITIONS ARE COMPLIED WITH."*

As stated, the warrant was issued on the condition that all of the conditions be satisfied before execution. On this basis, we find that the issuance of the warrant was proper.

We note here that, according to the complaint for warrant, probable cause existed at the time the warrant was issued. Thus, on appeal, it appears that a search warrant could have been issued instead of an "anticipatory" search warrant. However, for some reason the trial court issued an "anticipatory" search warrant. This issue is not discussed by the parties, and since there may have been some reason not evident from the record that an "anticipatory" warrant was issued, we choose not to pursue the issue here.

Defendant also challenges the execution of the "anticipatory" search warrant. Defendant asserts that, because only one of the two deliveries of LSD on December 11, 1991, was field tested for LSD, the condition that "a field test is [to be] performed on the perforated paper, with a positive result for the presence of [LSD]," was not satisfied. On this basis, he contends the warrant was improperly executed, and he asserts that his constitutional rights were violated.

•6 We determine that the standard to be adhered to in the context of police execution of "anticipatory" search warrants is the substantial compliance standard. We determine this for two reasons. First, upon reading the authority on "anticipatory" warrants, we found that there was no authority evident which adhered to a "strict compliance" standard for the police to execute such warrants. (See *United States v. Garcia* (2d Cir. 1989), 882 F.2d 699; *United States v. Dornhofer* (4th Cir. 1988), 859 F.2d 1195; *United States v. Hale* (9th Cir. 1986), 784 F.2d 1465; *United States v. Lowe* (6th Cir. 1978), 575 F.2d 1193; *United States ex rel. Beal v. Skaff* (7th Cir. 1969), 418 F.2d 430; *Johnson v. State* (Alaska 1980), 617 P.2d 1117; *State v. Cox* (1974), 110 Ariz. 603, 522 P.2d 29; *State v. Wright* (1989), 115 Idaho 1043, 772 P.2d 250; *Russell v. State* (1979), 182 Ind. App. 386, 395 N.E.2d 791;

*Commonwealth v. Soares* (1981), 384 Mass. 149, 424 N.E.2d 221; *People v. Glen* (1972), 30 N.Y.2d 252, 282 N.E.2d 614, 331 N.Y.S.2d 656; *Commonwealth v. Reviera* (1989), 387 Pa. Super. 196, 563 A.2d 1252.) Second, two of those cases set forth what we perceive to be a substantial compliance standard in addressing the requirements of the fourth amendment. (*Glen*, 30 N.Y.2d at 263, 282 N.E.2d at 619, 331 N.Y.S.2d at 664, citing *United States v. Ventresca* (1965), 380 U.S. 102, 108, 13 L. Ed. 2d 684, 688-89, 85 S. Ct. 741, 746; see also *Soares*, 384 Mass. at 152, 424 N.E.2d at 225.) In *Glen*, at issue was the wording of the "anticipatory" warrant: whether, by not being sufficiently specific, it would allow an unreasonable search and therefore be improperly issued. The court determined that the wording of the warrant, although not exact, was qualified by the particularities and exigencies that the executing officer faced in the performances of his duty and therefore was sufficient. (*Glen*, 30 N.Y.2d at 262, 282 N.E.2d at 618, 331 N.Y.S.2d at 663.) Although the case is factually dissimilar from the present case, the general principle which emerges from *Glen* is that the execution of such warrants is subject to the substantial compliance standard.

●7 In the present case, Officer Bright substantially complied with all four conditions precedent on December 11, 1991, so we determine the use of the "anticipatory" warrant was proper. First, the two "deliveries" of 1,000 doses and 1,700 doses of LSD, respectively, constituted the one transaction for 2,700 doses which was arranged for between Adams and Bright. We determine this because two deliveries took place within less than an hour of each other, were remarkably similar in relevant details, and constituted a continuous transaction. Both deliveries of LSD were from the same "source," carried the characteristic "Egyptian" eyeball insignia on each segment of perforated paper, and consisted of blotter paper perforated into three-eighth-inch squares. What is more, both purchases involved the same dealers, Adams and Okkema, and were carried out in the same manner.

Because Bright had to have substantial compliance with the four conditions precedent during the overall *transaction*, we determine that as long as each condition was satisfied on the first partial delivery, on the final delivery, or on both deliveries, then substantial compliance with the conditions existed. On December 11, 1991, the first delivery of LSD from Adams' source occurred at the McDonald's in Villa Park at about 7:45 p.m. as prearranged between Adams and Bright on the phone. There, Adams entered Bright's car and gave Bright a piece of paper in a plastic bag that was perforated into 1,000 squares. Bright, in return, gave Adams $1,500. Adams then exited

the truck and went to Okkema's vehicle. Bright exited his truck and went back to Officer O'Brien's car. There, each officer did a field test. Both tested positive on the LSD Bright had obtained from Adams. Bright then left the remaining 998 doses with O'Brien, took $2,500 in cash, returned to his truck, and took Okkema and Adams over to 315 Princeton.

There, another exchange of money and LSD was initiated. This time, Okkema exited the truck and entered apartment nine. He returned to the truck and Bright drove all three of the men back to McDonald's. Once back at McDonald's parking lot, the money and the drug were exchanged in the truck, the final transaction was concluded, and Bright gave the signal for an arrest to occur. Thus, before each delivery, condition (1) was satisfied; during the second delivery, condition (2) was satisfied; during the second delivery, condition (3) was satisfied; and during the first delivery, condition (4) was satisfied.

On the basis of the above facts, we determine that Bright *did* substantially comply with all four conditions precedent of the warrant, notwithstanding the fact that the second delivery of 1,700 units of LSD was not field tested. Officer Bright properly concluded that it was not necessary to field test a sample of the second delivery of LSD because it was evident that the two deliveries of LSD-impregnated perforated paper were the same material, came from the same source, and constituted the same transaction. On this basis, we determine that the warrant was properly executed, and find no error in the police officer's procedure.

For the foregoing reasons, we determine that the anticipatory warrant was constitutional, and its issuance and execution were proper. Therefore, we affirm the trial court's denial of the motion to quash the search warrant.

Affirmed.

DOYLE and COLWELL, JJ., concur.