Chief Justice RABNER
delivered the opinion of the Court.
For more than three decades, this Court has departed from federal law and recognized that, under the New Jersey Constitution, individuals have a reasonable expectation of privacy in information they provide to phone companies, banks, and Internet service providers in order to use commercial services. The Court has consistently applied that principle to protect personal information from unrestricted government access. No party in this appeal seeks to disturb that precept, which is a bedrock feature of New Jersey law.
As a general rule, the greater the degree of intrusion into one’s private matters by the government, the greater the level of protection that should apply. This appeal asks the Court to revisit the standard that should apply to telephone billing records sought in connection with a criminal investigation. The appeal also highlights inconsistencies in New Jersey’s ease law on privacy which have developed over time.
Telephone billing records, bank and credit card records, and Internet subscriber information can all reveal intimate details about a person’s life. The level of detail disclosed across all of those areas is relatively similar. Yet our case law has set different standards that law enforcement officers must meet to obtain information from those sources. Earlier decisions, with little analysis, required officials to seek a search warrant supported by probable cause to get access to telephone billing records; among other things, those records disclose the telephone numbers dialed to and from a particular phone but not the content of any conversations. To get access to bank records, though, which reveal the actual content of transactions, officials need only use a grand jury subpoena. A subpoena can be used if the documents are relevant to an ongoing criminal investigation, a lower threshold than probable cause.
*132 When the Court’s decisions in the area of privacy rights are read together, they reveal internal inconsistencies. We now attempt to resolve that tension in the law. Because telephone billing records reveal details of one’s private affairs that are similar to what bank and credit card records disclose, we conclude that both areas of information should receive the same level of constitutional protection and be available if they are relevant to an ongoing criminal investigation. More intrusive records, like cellphone location information, are entitled to greater protection and continue to require a search warrant.
To guard against the possibility of abuse in this sensitive area, however, we retain direct judicial oversight of the process and require the State to obtain a court order before it can ask a service provider to turn over telephone billing records. A judge may enter an order if law enforcement officials offer specific and articulable facts to demonstrate that telephone billing records are relevant and material to an ongoing criminal investigation. See N.J.S.A 2A:156A-29(e). We believe that this approach not only resolves the tension in existing case law, but also strikes an appropriate balance between legitimate privacy rights of individuals and society’s valid interest in investigating and preventing crime.
We therefore agree with the trial court’s decision to quash the grand jury subpoena the State served in this case, and direct that the State may apply for a court order to obtain the telephone billing records it seeks.
I.
The police arrested defendant Gary Lunsford after they executed a search warrant at his home on May 15, 2014. As part of a continuing investigation, the Monmouth County Grand Jury issued a subpoena duces tecum on June 19, 2014 to Célico Partnership, doing business as Verizon Wireless. The subpoena required Verizon to produce telephone records and global positioning system (GPS) data associated with defendant’s cell-phone number; *133 the number was the contact for controlled drug buys that provided the basis for the search warrant.
Six weeks later, the grand jury recalled the subpoena and issued a new one that omitted the request for GPS data — to comply with State v. Earls, 214 N.J. 564, 70 A.3d 630 (2013), which requires a search warrant for cell-phone location information. The new subpoena sought subscriber information for the cell phone, namely, billing and customer records, as well as call-detail records for the two weeks leading up to defendant’s arrest. Call-detail information includes the phone numbers dialed out from defendant’s cell phone, the phone numbers dialed in to that phone, and the date, time, and duration of those calls. That information is often referred to as “telephone billing records” or “telephone toll records.”
The State alerted defense counsel that it was seeking telephone billing records to give defendant the opportunity to move to quash the subpoena. Defendant filed a motion to quash, and the trial court granted the motion on January 16, 2015. In a written opinion, the trial court explained that under State v. Hunt, 91 N.J. 338, 450 A.2d 952 (1982), a communications data warrant, the equivalent of a search warrant, is needed to obtain telephone toll records.
The Attorney General, who superseded the Monmouth County Prosecutor’s Office to litigate the constitutional question this case raises, sought leave to appeal. The Appellate Division denied the request. The State then filed a motion for leave to appeal with this Court, which we granted. 223 N.J. 159, 121 A.3d 384 (2015).
II.
The Attorney General does not dispute that telephone billing records are entitled to protection under the State Constitution. He argues instead that a grand jury subpoena, based on a relevancy standard rather than probable cause, is sufficient to safeguard the privacy rights at stake.
*134 For support, the Attorney General traces the evolution of privacy rights under the State Constitution from Hunt, which addressed telephone billing records, to the present. He asserts that although Hunt found that customers enjoy a reasonable expectation of privacy in telephone billing records, the opinion did not address whether a grand jury subpoena would adequately protect that right. By contrast, the Attorney General contends, more recent case law relating to the privacy rights in bank records, State v. McAllister, 184 N.J. 17, 875 A.2d 866 (2005), Internet subscriber information, State v. Reid, 194 N.J. 386, 945 A.2d 26 (2008), and cellphone location information, Earls, supra, 214 N.J. 564, 70 A.3d 630, “strongly suggest ... that a grand jury subpoena is all that is needed.” According to the Attorney General, bank and Internet subscriber records can reveal intimate details about a customer’s private life that compare to the level of information disclosed in telephone billing records; as a result, those areas should be treated similarly under the law. The Attorney General, therefore, argues that this Court should reconcile Hunt with its more recent opinions.
The Attorney General contends that the grand jury subpoena process works well to protect State constitutional privacy rights, that the law in other jurisdictions does not support sustaining a warrant requirement, and that the legitimate needs of law enforcement offer further support for the use of grand jury subpoenas to obtain telephone billing records. In particular, the Attorney General notes that a probable cause standard delays prosecutors from gathering toll records at an early stage in a criminal investigation and, as a result, lengthens the amount of time needed to conduct criminal investigations.
Defendant argues that Hunt not only found a reasonable expectation of privacy under the State Constitution in telephone billing records but that it also imposed a warrant requirement for the police to obtain those records. Because call-detail records can “paint a picture” of defendant’s private life, he maintains that Hunt was correctly decided and should not be overturned. Defen *135 dant adds that the Attorney General has not presented any special justification to overturn Hunt.
Defendant also argues that the grand jury subpoena process, guided by a relevancy standard with no judicial oversight, does not adequately protect a citizen’s privacy rights. Defendant claims that a warrant requirement is the only way to guarantee the needed level of protection.
We granted amicus curiae status to (1) the American Civil Liberties Union of New Jersey, the Brennan Center for Justice, the Electronic Frontier Foundation, and the Office of the Public Defender (collectively, the ACLU), which submitted a joint brief, and (2) the Association of Criminal Defense Lawyers of New Jersey (ACDL).
Amici expand upon the arguments defendant raises. They contend that Hunt expressly and correctly imposed a warrant requirement and should not be overturned. The ACLU argues that telephone billing records, particularly when collected in bulk, can reveal intimate private information that only a warrant can adequately protect. The ACDL, likewise, highlights the expansive range of information that call-detail records can reveal. The ACDL also stresses that telephone billing records are quite revealing in the aggregate and pose particular concerns for whistle-blowers, journalists, people who seek confidential advice on health issues, and others.
In addition, amici argue that the Attorney General has misread this Court’s rulings on privacy. They contend that the privacy interest in telephone billing records recognized in Hunt is of the highest order, and that just because tracking an individual’s movements may be more invasive than obtaining telephone toll, bank, or ISP (Internet service provider) records, it does not logically follow that telephone billing records merit less protection than cell-phone location data or should be treated the same as bank or ISP records.
*136 Finally, amici argue that the grand jury process is controlled by the prosecutor and does not adequately protect the privacy interests involved.
III.
Over the years, this Court has recognized a constitutionally protected right to privacy in various types of information: telephone toll records, bank records, subscriber information provided to an Internet Service Provider, and cell-phone location data. See Hunt, supra, 91 N.J. 338, 450 A.2d 952; McAllister, supra, 184 N.J. 17, 875 A.2d 866; Reid, supra, 194 N.J. 386, 945 A.2d 26; Earls, supra, 214 N.J. 564, 70 A.3d 630. In doing so, the Court has parted company with federal law and relied on the State Constitution.[1]
Beyond the threshold question of whether a privacy right exists lies another inquiry: what level of protection is appropriate to safeguard an individual’s privacy interest? Early case law gave little attention to the second question. Later decisions, dating back a decade, examined the issue by balancing both individual privacy rights and society’s interest in investigating and halting criminal activity. Today, we are called upon to assess and reconcile the tension that has developed over time in this area.
A.
The Court’s 1982 decision in Hunt marks an important point in the chronology. The case arose out of an investigation into an illegal sports gambling operation. Hunt, supra, 91 N.J. at 341, 450 A.2d 952. During the investigation, an informant told the State Police that the defendant conducted a daily gambling business over two telephone lines. Ibid. A detective asked the tele *137 phone company for telephone billing records for both numbers for a two-month period, and the company complied. Ibid. The State Police later obtained court orders for a pen register and a wiretap. Id. at 342, 450 A.2d 952.
Hunt analyzed with care whether the defendant had a “protecti-ble interest” in telephone billing records under the Federal and State Constitutions. Id. at 342-43, 450 A.2d 952. The Court quoted Justice Stewart’s observation that a list of dialed telephone numbers “easily could reveal the identities of the persons and the places called, and thus reveal the most intimate details of a person’s life.” Id. at 347, 450 A.2d 952 (quoting Smith v. Maryland, 442 U.S. 735, 748, 99 S.Ct. 2577, 2584, 61 L.Ed.2d 220, 231 (1979) (Stewart, J., dissenting)).
Hunt noted that federal case law did not recognize a “legitimate expectation of privacy in information voluntarily turned over to third parties,” id. at 343-44, 450 A.2d 952, a principle commonly referred to as the “third-party doctrine.” As a result, individuals have no expectation of privacy under federal law in pen register information (a list of local and long distance numbers dialed), ibid. (citing Smith, supra, 442 U.S. at 740, 99 S.Ct. at 2580, 61 L.Ed.2d at 226-27), or in financial information that customers convey to banks, id. at 344 n. 1, 450 A.2d 952 (citing United States v. Miller, 425 U.S. 435, 442, 96 S.Ct. 1619, 1623, 48 L.Ed.2d 71, 79 (1976)).
The Hunt Court observed that New Jersey had followed a different approach and afforded “the utmost protection” against tapping phones to hear “telephonic communications.” Id. at 345, 450 A.2d 952. The Court also emphasized that telephone customers — in 1982 — placed calls “from a person’s home or office, locations entitled to protection” under the Federal and State Constitutions. Id. at 347, 450 A.2d 952.
The Court specifically rejected the third-party doctrine. Hunt explained that telephone callers are entitled to assume that not only the words they utter but also the numbers they dial in private “will be recorded solely for the telephone company’s business purposes.” Ibid. The Court added, “[i]t is unrealistic to say that *138 the cloak of privacy has been shed because the telephone company and some of its employees are aware of’ billing records. Ibid. The Court therefore concluded that toll billing records were “part of the privacy package” and were entitled to protection under the State Constitution. Id. at 347-48, 450 A.2d 952.
The bulk of the Court’s thoughtful analysis focused on whether to diverge from federal law and recognize a privacy interest in telephone billing records. The opinion devoted little attention to the steps law enforcement officials must take to obtain protected billing records. At one point, the decision observed that allowing “seizures” of telephone billing records “without warrants can pose significant dangers to political liberty.” Id. at 347, 450 A.2d 952. The passage was a prelude to a brief discussion of an actual abuse that had occurred: the FBI obtained toll billing records for columnist Jack Anderson after he wrote a “column embarrassing to former Vice President Agnew”; a source whose telephone number appeared in the records then lost his job as a city attorney. Ibid.
Two paragraphs later, the opinion cited state court decisions that followed or departed from the federal third-party doctrine. Id. at 348, 450 A.2d 952. After siding with the latter group, the paragraph concluded, “[t]hus we are satisfied that the police wrongfully obtained the toll billing records of the defendant Hunt in that they were procured without any judicial sanction or proceeding.” Ibid, (emphasis added). The Court did not elaborate on the meaning of the phrase.
In reaching its conclusion, the Court in Hunt did not mention its earlier decision in In re Addonizio, 53 N.J. 107, 248 A.2d 531 (1968). In that ruling, the Court addressed a defendant’s effort to set aside grand jury subpoenas served on a bank and a brokerage firm for his account records. The defendant attempted to assert a claim under the Fourth Amendment. Id. at 131, 248 A.2d 531. Chief Justice Weintraub rejected the argument and distinguished Brex v. Smith, 104 N.J. Eq. 386, 146 A. 34 (Ch.1929). In that case, “the prosecutor, without any judicial process, called upon *139 banks to deliver” certain account records. Addonizio, supra, 53 N.J. at 134, 248 A.2d 531 (emphasis added). “It is enough to say,” the Addonizio Court explained, that “a grand jury subpoena would be something else.” Ibid.[2] Hunt did not consider the issue or cite Addonizio.
Justice Pashman authored a concurring opinion in Hunt which pointedly addressed the risk of abuse: “What is missing from the majority opinion is a full appreciation of the danger of political abuse posed by unlimited police access to knowledge of whom private citizens are calling and therefore of the importance of the warrant requirement as a check on this potential for abuse.” Hunt, supra, 91 N.J. at 351, 450 A.2d 952 (Pashman, J., concurring). The concurrence also directly stated that “police [must] obtain a warrant before seizing toll billing records.” Id. at 352, 450 A.2d 952. Because “[t]here is no danger that billing records will be destroyed ... during the time needed to get a warrant,” Justice Pashman wrote, the requirement “is at most a minimal burden that in no way intrudes upon legitimate police activity.” Ibid.
By contrast, the references to warrants in the majority opinion offer little analysis and are not as explicit. Viewing the opinion as a whole, it appears that the parties and the Court focused on whether New Jersey should recognize a privacy interest in tele *140 phone billing records under the State Constitution. Indeed, the majority opinion framed the issue in the case in just that way. See id. at 342-13, 450 A.2d 952 (“The key questions are whether an individual has a protectible interest in [toll billing] records under the Fourth Amendment to the Federal Constitution or Article I, par. 7 of the New Jersey Constitution.”). It is not possible to tell if the advocates even argued about what level of protection that right would require.
The Attorney General explains that, in response to Hunt, the State took a cautious approach and consistently sought warrants to obtain telephone toll records.
State v. Mollica, 114 N.J. 329, 554 A.2d 1315 (1989), decided seven years after Hunt, cemented a warrant requirement for telephone billing records. Mollica considered whether to extend State constitutional protections to billing records for a hotel-room telephone. In the case, anonymous sources told the FBI that an individual had operated an illegal bookmaking enterprise from hotel rooms in Atlantic City. Id. at 335, 554 A.2d 1315. Without a search warrant, federal agents obtained the suspect’s telephone records from the hotel. Ibid. The FBI later turned the records over to state officials, who used the information to get a search warrant. Id. at 335-36, 554 A.2d 1315. The defendants, in turn, challenged the search and claimed it was based on an unconstitutional seizure of their hotel-room telephone billing records. Id. at 336, 554 A.2d 1315.
The Court found no basis to distinguish between the expectation of privacy in billing records for a home telephone and a phone in a hotel room. Id. at 342, 554 A.2d 1315. The “broader view of ... privacy that surrounds the use of a telephone” applied in both settings and called for protection under the State Constitution. Id. at 344-45, 554 A.2d 1315.
The Court next turned to the process required and briefly concluded, “[i]t therefore follows ineluctably that the official seizure of hotel-telephone billing or toll records relating to a guest’s use of a hotel-room telephone is subject to the requirements of *141 antecedent probable cause and the issuance of a search warrant” under the State Constitution. Id. at 345, 554 A.2d 1315 (citation omitted). For support, the Mollica Court cited only the passage in Hunt that noted the police wrongfully obtained billing records because they were procured “-without any judicial sanction or proceeding.” Ibid. (quoting Hunt, supra, 91 N.J. at 348, 450 A.2d 952).
The next link in the chain is McAllister, which addressed bank records in 2005. This time, the Court undertook a deliberative, two-part analysis: it first considered whether account holders have a reasonable expectation of privacy in their bank records, and then assessed what level of protection should apply to that information. McAllister, supra, 184 N.J. at 19, 875 A.2d 866.
At the outset, the Court recounted New Jersey’s departure from the third-party doctrine. Under federal law, records that customers voluntarily convey to banks enjoy no Fourth Amendment protection. See Miller, supra, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71. By contrast, Brex and Addonizio took a more restrictive approach. McAllister, supra, 184 N.J. at 28, 875 A.2d 866. Brex “recognized that account holders expect their banks to keep their records confidential, even in the face of a government official’s formal request,” and Addonizio, four decades later, “implicitly recognized” that interest. Id. at 26-28, 875 A.2d 866.
The McAllister Court then directly addressed the privacy interest in bank records. Id. at 29, 875 A.2d 866. The Court began by noting how revealing the records are:
Bank records, like long distance billing records, differ from other documents that memorialize an individual’s affairs. On their face, bank records are simply a collection of numbers, symbols, dates, and tables. They are a veritable chronicle of the mundane: the payment of a nominal ATM fee, the automatic deposit of a paycheck, the monthly interest earned on a savings account. However, when compiled and indexed, individually trivial transactions take on a far greater significance. “In the course of such dealings, a depositor reveals many aspects of his personal affairs, opinions, habits and associations. Indeed, the totality of bank records provides a virtual current biography.”
[Id at 30-31, 875 A.2d 866 (quoting Burrows v. Superior Court, 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590, 596 (1975)).]
*142 The Court also explained that “bank customers voluntarily provide their information to banks, but they do so with the understanding that it will remain confidential.” Id. at 31, 875 A.2d 866. The Court therefore held that the State Constitution “recognizes an account holder’s interest in the privacy of his or her bank records.” Id. at 32-33, 875 A.2d 866.[3]
Next, McAllister analyzed the level of protection needed to safeguard that privacy interest “in view of law enforcement’s legitimate investigatory needs.” Id. at 33, 875 A.2d 866. The Court rejected the ACDL’s position that probable cause was required. See id. at 24, 33, 875 A.2d 866. In doing so, the Court relied on Addonizio, which explained “that grand juries have never been bound only to investigate charges that were already supported by probable cause.” Id. at 33, 875 A.2d 866 (citing Addonizio, supra, 53 N.J. at 124, 248 A.2d 531). The McAllister Court quoted- Chief Justice Weintraub, who had observed that “the probable cause required for a search warrant is foreign to this scene.... [A grand jury’s] power to investigate would be feeble indeed if [it] had to know at the outset everything needed to arrest a man or to invade his home.” Id. at 33-34, 875 A.2d 866 (quoting Addonizio, supra, 53 N.J. at 126, 248 A.2d 531).
McAllister affirmed “the expansive investigatory power of grand juries,” id. at 34, 875 A.2d 866, “bounded by relevancy and safeguarded by secrecy,” id. at 42, 875 A.2d 866, and held that a grand jury subpoena based on a relevancy standard was adequate to protect an individual’s privacy interest in bank records, id. at 36, 875 A.2d 866. A showing of probable cause, ordinarily required for a search warrant, was not required. Ibid.
*143 Notably, McAllister contains but a single substantive reference to Hunt. McAllister simply states that because Hunt did not involve a grand jury subpoena, the opinion did not “require[ ] a different result in this appeal.” Id. at 36, 875 A.2d 866.[4]
State v. Domicz, 188 N.J. 285, 907 A.2d 395 (2006), followed soon after McAllister. In Domicz, the Court held that a grand jury subpoena was sufficient to protect any privacy interest in an individual’s utility records. Id. at 299-301, 907 A.2d 395. In its analysis, the Court underscored how revealing bank records are:
Bank records may reveal all types of household items purchased and possessed by a person, such as furniture, artwork, and electronic equipment. Through check and debit card payments, those records may disclose what a person eats and drinks, what newspapers and magazines he reads, and even where he vacations. Bank records also may indicate the amount of a person’s utility and telephone bills. [Id. at 299-300, 907 A.2d 395.]
By contrast, utility records expose far less “about a person’s private life and activities within the home.” Id. at 299, 907 A.2d 395. The Court thus found no basis to treat “utility records differently from bank records.” Ibid. It upheld the use of a grand jury subpoena to obtain utility records and did not require the police to secure a warrant. Id. at 300-01, 907 A.2d 395.
Reid, supra, decided in 2008, drew on similar themes and followed the same two-part approach. In that case, someone had accessed a company’s website and fraudulently changed the company’s shipping address. 194 N.J. at 392, 945 A.2d 26. A supplier captured the user’s Internet Protocol (IP) address and reported it to the owner of the company; the owner later relayed the IP address to the police. Ibid. The police issued a deficient subpoena *144 to Comcast, the service provider to which the address was registered, to obtain information about the IP address. Id. at 392-93, 945 A.2d 26. In response, Comcast identified the defendant as the subscriber of the IP address and provided subscriber information including her name, address, telephone number, and other account details. Id. at 393, 945 A.2d 26.
The Court again departed from the federal third-party doctrine and held that subscriber information that individuals provide to an Internet service provider is entitled to protection under the State Constitution. Id. at 399, 945 A.2d 26. The Court explained that
ISP records share much in common with long distance billing information and bank records. All are integrally connected to essential activities of today’s society. Indeed, it is hard to overstate how important computers and the Internet have become to everyday, modem life. Citizens routinely access the Web for all manner of daily activities: to gather information, explore ideas, read, study, shop, and more.
In addition, while decoded IP addresses do not reveal the content of Internet communications, subscriber information alone can tell a great deal about a person. With a complete listing of IP addresses, one can track a person’s Internet usage. “The government can learn the names of stores at which a person shops, the political organizations a person finds interesting, a person’s ... fantasies, her health concerns, and so on.” Daniel Solove, The Future of Internet Surveillance Law, 72 Geo. Wash L.Rev. 1264,1287 (2004). Such information can reveal intimate details about one’s personal affairs in the same way disclosure of telephone billing records does. Although the contents of Internet communications may be even more revealing, both types of information implicate privacy interests.
[Id. at 398-99, 945 A.2d 26.[5]]
The Court went on to consider “the type of protection ISP subscriber information should receive in the face of legitimate investigative needs.” Id. at 402, 945 A.2d 26. The Court revisited Addonizio, McAllister, and Domicz and concluded, “we see no material difference between bank records and ISP subscriber information and decline to treat them differently.” Id. at 404, 907 *145 A.2d 395. In both cases, the Court held, “a grand jury subpoena based on a relevancy standard is sufficient to meet constitutional concerns.” Ibid. The Court did not rely on, or even refer to, Hunt in that discussion.
In 2013, the Court returned to the question of privacy in the context of cell-phone location information. Earls, supra, 214 N.J. 564, 70 A.3d 630. In Earls, the police obtained an arrest warrant for the defendant because of his role in a series of residential burglaries. Id. at 570-71, 70 A.3d 630. Law enforcement began looking for the defendant and an ex-girlfriend, whom the defendant allegedly threatened after he learned about her cooperation in the investigation. Ibid. The police contacted T-Mobile, a cellphone service provider, which provided information on three occasions — without a warrant — about the location of a cell phone believed to be used by the defendant. Id. at 571-72, 70 A.3d 630. That information led to the defendant’s arrest. Id. at 572, 70 A.3d 630.
The Court noted that a cell phone automatically registers or identifies itself with the nearest cell site every seven seconds, even when no calls are made. Id. at 576-77, 70 A.3d 630. With existing technology in 2013, “cell-phone providers [could] pinpoint the location of a person’s cell phone with increasing accuracy,” and in some areas could even locate users within individual floors and rooms inside buildings. Id. at 577, 70 A.3d 630.
The Court reviewed federal law and considered United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), and United States v. Karo, 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), which together “found no reasonable expectation of privacy in the monitoring of tracking devices in public, as opposed to private, areas.” Earls, supra, 214 N.J. at 580-81, 70 A.3d 630. Earls also discussed a more recent decision, United States v. Jones, 565 U.S. -, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012), in which a majority of the United States Supreme Court held that the installation of a GPS tracking device on a car constituted a *146 trespass on private property and required a warrant. Earls, supra, 214 N.J. at 682, 70 A.3d 630.
Justice Alito, who concurred with three other Justices, would have analyzed the case under a reasonable-expectation-of-privacy framework. Jones, supra, 565 U.S. at-, 132 S.Ct. at 963-64, 181 L.Ed.2d at 933-34 (Alito, J., concurring). He observed that “relatively short-term monitoring of a person’s movements on public streets accords with expectations of privacy that our society has recognized as reasonable”; “[b]ut the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.” Id. at-, 132 S.Ct. at 964, 181 L.Ed.2d at 934 (citation omitted). Justice Sotomayor, who joined the majority opinion, also concurred separately. She agreed with Justice Ali-to’s views on longer term tracking and added that “even short-term [GPS] monitoring ... will require particular attention.” Id. at-, 132 S.Ct. at 955, 181 L.Ed.2d at 925. Both concurrences addressed GPS monitoring and the details it revealed, not toll billing records. See, e.g., ibid. (Sotomayor, J., concurring) (“GPS monitoring generates a precise, comprehensive record of a person’s public movements that reflects a wealth of detail.”).
Earls reasoned from the concurring opinions in Jones as well as settled state law. It reiterated that all three types of information discussed in Hunt, McAllister, and Reid can be very revealing, and compared them to cell-phone location data. Earls, supra, 214 N.J. at 585, 70 A.3d 630.
Using a cell phone to determine the location of its owner can befar more revealing than acquiring toll billing, bank, or Internet subscriber records. It is akin to using a tracking device and can function as a substitute for 24/7 surveillance without police having to confront the limits of their resources. It also involves a degree of intrusion that a reasonable person would not anticipate. See Jones, supra, 565 U.S. at-, 132 S.Ct. at 964, 181 L.Ed.2d at 934 (Alito, J., concurring). Location information gleaned from a cell-phone provider can reveal not just where people go — which doctors, religious services, and stores they visit — but also the people and groups they choose to affiliate with and when they actually do so. That information cuts across a broad range of personal ties with family, friends, political groups, health care providers, and others. See id. at-, 132 S.Ct. at 955-56, 181 L.Ed.2d at 925 (Sotomayor, J., concurring). In other words, details about the location of a cell phone can provide an intimate picture of one’s daily life.
*147 [Id. at 586, 70 A.3d 630 (emphasis added).]
The Court concluded that cell-phone users have a reasonable expectation of privacy in the location of their cell phones, which is entitled to protection under the State Constitution. Id. at 587-88, 70 A.3d 630. The sentence underscored in the above passage, though, does not resolve this appeal because it does not differentiate among telephone billing, bank, and Internet records; it merely notes that tracking one’s location through a cell phone is more revealing than the other three kinds of information.
Earls also separately considered what level of protection the privacy right required. The Court noted that, “[a]s a general rule, the more sophisticated and precise the tracking, the greater the privacy concern.” Id. at 587, 70 A.3d 630. “Because of the nature of the intrusion, and the corresponding, legitimate privacy interest at stake,” the Court held that the “police must obtain a warrant based on a showing of probable cause” to get tracking information through a cell phone, unless exigent circumstances or another exception to the warrant requirement applies. Id. at 588, 70 A.3d 630. Earls did not rely on Hunt to support that holding.
B.
The above survey reveals that our jurisprudence is not internally consistent. Telephone billing records — a list of phone numbers dialed out of and in to a phone, along with the time and duration of those calls — are, of course, quite revealing. That is why they are entitled to protection under the State Constitution, even though they do not disclose the contents of any communications.
Amici argue that telephone billing records are “content-laden” and “suggestive” of content, particularly when they are aggregated. But are telephone billing records more revealing than bank records, which reveal actual content? Bank records contain not only a tally of dates and dollar amounts; they also include copies of actual checks that disclose who was paid, for how much, often for what services, and when. The contents of a checkbook can expose the doctors we use, the political parties and religious *148 groups we contribute to, and payments to intimate associates that are meant to be kept private. Credit card statements offer similar details. Also, as Reid explained, ISP subscriber information can disclose comparable personal details; if matched to an IP address, the information can help track a person’s Internet usage. Reid, supra, 194 N.J. at 398, 945 A.2d 26.
All three areas — telephone billing records, bank records, and Internet subscriber information — are less intrusive than a device that permits 24/7 tracking. Yet it is hard to differentiate among the three in terms of the reasonable expectation of privacy that attaches to each. Bank account records, credit card statements, and Internet subscriber information can be just as revealing as telephone billing information.
The ACDL argues that telephone billing records, which are expressed in a standardized format, are easy to aggregate and analyze, particularly in light of modern technology. The ACDL also contends that society’s reliance on telecommunications has increased with the rise of mobile phones. But standardized bank records can also be aggregated and analyzed. And just as mobile phones have arguably increased the amount of data available, the widespread replacement of cash with credit and debit cards and mobile payment systems has also added to society’s trail of financial transactions. See Geoffrey R. Gerdes and Kathy C. Wong, Federal Reserve Bulletin, Recent Payment Trends in the United States A77 (Oct. 2008), http://www.federalreserve.gov/pubs/ bulletin/2008/pdf/payments08.pdf (showing nearly three-fold increase in number of non-cash payments per person in United States from 1971 to 2006); Federal Reserve System, The 2013 Federal Reserve Payments Study 15 (2014), https://www. frbservices.org/files/communications/pdf/genera]/2013_fe(Ljres_ paymt_study_detailed_rpt.pdf (showing approximately 29-percent increase in total non-cash payments in United States from 2006 to 2012).
Bank records arguably reveal more to law enforcement than telephone billing records because of the actual content they con *149 tain. Yet our law has given greater protection to telephone billing records, which do not disclose content. In other words, if bank records are relevant to an investigation, law enforcement can seek them with a subpoena; to obtain telephone billing records, though, officers have been required to meet a higher threshold and show probable cause.
One reason for the disparate approach in our case law is the manner in which it developed. Hunt and Mollica did not consider legitimate investigative needs when they together imposed a warrant requirement to obtain telephone billing records. McAllister and Reid weighed that concern but did not wrestle with Hunt. This appeal requires that we do both. We are called on to analyze and reconcile different strands in the law — to assess genuine privacy concerns as well as valid law enforcement aims across related areas.
To do that, in addition to evaluating how intrusive toll records can be, as Hunt did, we consider the practical impact of requiring a search warrant-based on probable cause — to obtain telephone toll records. Probable cause for a warrant requires proof “to believe that a crime has been or is being committed at a specific location or that evidence of a crime is at the place to be searched.” State v. Evers, 175 N.J. 355, 381, 815 A.2d 432 (2003) (citations omitted). In the context of a warrant for telephone billing records, a judge must be convinced that there is probable cause to believe the records sought contain evidence of a crime— not simply that the records are relevant to an ongoing criminal investigation. To amass enough evidence to meet the higher standard inevitably slows down investigations in the early stages, particularly in matters that involve more complex schemes. That approach runs counter to both the traditional authority of the grand jury, see Addonizio, supra, 53 N.J. at 126, 248 A.2d 531, and society’s legitimate interest in having officials promptly investigate and try to interrupt criminal activity.
To be sure, if the police choose to use highly intrusive techniques, like obtaining cell-phone location information, they must *150 establish probable cause notwithstanding the impact that standard may have on the pace of an investigation. But when the police request less intrusive information, a relevance standard can protect valid privacy concerns and allow appropriate investigations to proceed.[6]
C.
We are not the only state to consider the standard the police must satisfy to obtain telephone billing records. In the three decades since Hunt and Mollica, however, only a handful of states have imposed a probable cause requirement.
Federal law permits law enforcement to obtain telephone billing records with a grand jury or trial subpoena or an appropriate administrative subpoena. See 18 U.S.C.A. § 2703(c)(2). That standard remains in place after Riley v. California, — U.S. - 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014).
*151 Defendant relies on Riley and contends that it requires the use of a search warrant to access telephone connection records. Riley, however, involved a warrantless search of the contents of a smartphone seized incident to an arrest. As the United States Supreme Court explained, a search of a modern cell phone can reveal vast amounts of private personal information, “from the mundane to the intimate”: photographs, text messages, one’s Internet browsing history, calendar, personal contacts, historic location information, various apps, and more. Id. at -, 134 S.Ct. at 2489-91, 189 L.Ed.2d at 446-48. Because smartphones contain and may reveal “the privacies of life,” the Court held that law enforcement officers must get a warrant before they may search the contents of a cell phone seized incident to arrest. Id. at -, 134 S.Ct. at 2494-95, 189 L.Ed.2d at 452 (citation omitted). Riley did not address telephone billing records and did not alter the prevailing federal standard to obtain that information.
A large majority of states use the same type of standard and allow law enforcement to obtain telephone billing information based on some form of a relevancy standard.[7]
*152 Five states require a showing of probable cause. In three states, the rule is imposed by statute;[8] in two, it is based on case law that interprets the state’s constitution.[9]
In 2006, the New Jersey Legislature unanimously amended the Wiretap Act to require service providers to disclose telephone records to law enforcement in response to a grand jury subpoena. See L. 2005, c. 270 (codified as amended at N.J.S.A. 2A:156A-29(f) (2006)). The provision mirrors federal law. See 18 U.S.C.A § 2703(c)(2). Because the amendment conflicts with the standard set in Hunt and Mollica, it has not been followed. It nevertheless reflects the Legislature’s view of what a reasonable expectation of privacy in this area calls for, and is entitled to respectful consideration. See Reid, supra, 194 N.J. at 401, 945 A.2d 26 (noting *153 Legislature’s determination to protect against disclosure of ISP information).
The judicial branch, of course, has the obligation and the ultimate responsibility to interpret the meaning of the Constitution and the protections it requires. Asbury Park Press, Inc. v. Woolley, 33 N.J. 1, 12, 161 A.2d 705 (1960). Although the actions of other states may be informative, in the end we are guided by the language and history of the New Jersey Constitution.
D.
We pause to underscore what this case is not about: the collection of bulk data from telephone service providers for large numbers of customers, over an extended period of time, by an agency that does not conduct criminal investigations. Much has been written about the recent efforts of the National Security Agency (NSA) to collect large amounts of telephone metadata on an ongoing basis. The Second Circuit recently found that the NSA’s program exceeded the scope of what Congress had authorized and violated the Patriot Act. See ACLU v. Clapper, 785 F.3d 787, 826 (2d Cir.2015). New Jersey’s Attorney General stresses that the NSA program presents a “markedly different” practice that is “completely distinct” from the grand jury subpoena process.
We do not address or sanction the NSA’s practice in this opinion. The subpoena at the center of this appeal seeks two weeks of telephone billing records, for a single phone line, in connection with an ongoing criminal investigation. That is not the same as an effort by a non-law enforcement agency, acting outside the criminal arena, to obtain, aggregate, and retain bulk data about the use of telephone facilities by a large number of individuals.
E.
We continue to believe that telephone billing records, bank records, and ISP subscriber information disclose private informa *154 tion that is entitled to constitutional protection. Our law, therefore, does not allow police officers simply to contact a service provider and ask for those records.
As we have noted before, the greater the degree of intrusion into an individual’s personal affairs, the greater the privacy concern. See Earls, supra, 214 N.J. at 587, 70 A.3d 630. We find that all three types of records reveal comparable amounts of private information and are similarly intrusive. Indeed, the language in Hunt, McAllister, and Reid contains similar themes and examples of the types of personal information that may be disclosed. See Hunt, supra, 91 N.J. at 347, 450 A.2d 952; McAllister, supra, 184 N.J. at 30-31, 875 A.2d 866; Reid, supra, 194 N.J. at 398-99, 945 A.2d 26. Because the privacy concerns in all three areas are similar, the records should receive comparable levels of protection. See Reid, supra, 194 N.J. at 404, 945 A.2d 26 (“[Records that] reveal comparably detailed information about one’s private affairs ... are entitled to comparable protection under our law.”).
Defendant does not acknowledge the inconsistency in our case law. For that reason, he views the State’s petition as an effort to overturn Hunt. This appeal, however, viewed in the context of three decades of jurisprudence, is about reconciling and restoring consistency to a challenging area of law, which we have attempted to do.
Looking at the full spectrum of cases the Court has decided in recent decades, we conclude that the relevance standard adopted in McAllister and Reid appropriately protects individual privacy rights in telephone billing records and at the same time recognizes society’s legitimate interest in investigating criminal activities.
We also appreciate the possibility for abuse in this sensitive area. Hunt, supra, addressed that issue decades ago, 91 N.J. at 347, 450 A.2d 952, and it remains a concern today. We therefore retain direct judicial oversight as part of the process to obtain telephone billing records.
*155 We direct that, going forward, the State must apply for a court order under N.J.S.A. 2A:156A-29(e) to obtain telephone billing or toll records. In accordance with that statute, law enforcement must demonstrate “specific and articulable facts showing that there are reasonable grounds to believe that” the records sought are “relevant and material to an ongoing criminal investigation.” N.J.S.A. 2A:156A-29(e). The requested records must cover a finite period of time which does not extend beyond the date of the order.
Judicial review of ex parte applications of this type will help guard against abuses in general and root out bulk requests for information that are unconnected to a criminal investigation. In addition, a judge may quash or modify an order “if the information or records requested are unusually voluminous,” among other reasons. Ibid.
IV.
For the reasons stated above, we affirm the trial court’s decision to quash the grand jury subpoena for telephone billing records. The State may apply for a court order to obtain those records in this case, consistent with the principles discussed above.
Justices PATTERSON, FERNANDEZ-VTNA and SOLOMON join in Chief Justice RABNER’s opinion. Justice LaVECCHIA filed a separate, concurring and dissenting opinion in which Judge CUFF (temporarily assigned) joins. Justice ALBIN did not participate.

 The United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures....” U.S. Const amend. IV. Article I, Paragraph 7 of the New Jersey Constitution contains nearly identical language.

 Grand jury investigations, in practice, are directed by the prosecutor, who ordinarily proposes witnesses to be called and issues subpoenas in the grand jury's name. See In re Grand Jury Subpoena Issued to Galasso, 389 N.J.Super. 281, 293, 913 A.2d 78 (App.Div.2006). But “[t]he grand jury is a judicial, investigative body, serving a judicial function; it is an arm of the court, not a law enforcement agency or an alter ego of the prosecutor's office.” In re Grand Jury Appearance Request by Loigman, 183 N.J. 133, 141, 870 A.2d 249 (2005). The grand jury also operates under the authority of the Judiciary. See McAllister, supra, 184 N.J. at 42-43, 875 A.2d 866 (noting Supreme Court's supervisory authority over grand juries); State v. Murphy, 110 N.J. 20, 31-33, 538 A.2d 1235 (1988) (discussing statutory responsibility of Court to promulgate rules and regulations governing State grand juries); N.J.S.A. 2B:22-5 (authorizing Chief Justice to designate judges to "maintain judicial supervision over the grand jury”).

 Nowhere does McAllister suggest that customers have a reduced expectation of privacy because of federal reporting requirements for certain large cash transactions. See post at 163-64, 141 A.3d at 290-91. Nor would that logically follow. To the extent that account holders realize that a cash transaction of more than $10,000 should result in the filing of a currency transaction report, how would that affect their reasonable expectation of privacy in the countless non-cash transactions that appear in their bank statements? McAllister specifically focused on the latter, more revealing, transactions.

 The Court in McAllister declined to require the State to give notice to the target of the grand jury’s investigation and invited the Criminal Practice Committee to further study "the benefits and burdens of enhanced protections for bank records.” Id. at 42-43, 875 A.2d 866. The Criminal Practice Committee later surveyed prosecutors and defense counsel and concluded that the subpoena process, without notice, struck “a fair balance between an account holder’s right to privacy and the legitimate needs of law enforcement to investigate alleged criminal activity.” Report of the Supreme Court Criminal Practice Committee 2007-2009 Term at 133-34 (Feb. 17, 2009).

 The subpoena in Reid sought subscriber information, not the subscriber’s Internet search or browsing history. The State has not argued in this appeal that a grand jury subpoena would be sufficient to obtain the latter kind of information, which would directly reveal content.

 The dissent focuses on pen registers. Unlike toll billing records, which present a list of phone numbers dialed after the fact, a pen register tracks each call as it is made. Law enforcement officials who monitor a pen register get real-time information about all local and long distance numbers dialed, including calls that are not completed. See State v. Feliciano, 224 N.J. 351, 358 n. 1, 132 A.3d 1245 (2016). Pen registers thus disclose current activity, around the clock, in a manner that reveals more than toll billing records.
A number of jurisdictions, in fact, require law enforcement to meet a heightened standard to obtain a pen register, as compared to toll billing records. See, e.g., State v. Thompson, 114 Idaho 746, 760 P.2d 1162, 1168 (1988) (pen register), Idaho Code Ann. § 19-3004A (2016) (billing records); In re Original Investigation, Special Grand Jury, 273 Ind. 120, 402 N.E.2d 962, 964 (1980) (pen register), In re Order for Ind. Bell Tel. to Disclose Records, 214 Ind. 131, 409 N.E.2d 1089, 1090-91 (1980) (billing records), overruled in part on other grounds by S.H. v. State, 984 N.E.2d 630 (Ind.2013); Dist. Attorney for Plymouth Dist. v. New England Tel. & Tel. Co., 379 Mass. 586, 399 N.E.2d 866, 868-70 (1980) (pen register), Commonwealth v. Vinnie, 428 Mass. 161, 698 N.E.2d 896, 909-10, cert. denied, 525 U.S. 1007, 119 S.Ct. 523, 142 L.Ed.2d 434 (1998) (billing records); Mont.Code Ann. § 46-4-403 (2016) (pen register), Hastetter v. Behan, 196 Mont. 280, 639 P.2d 510, 512-13 (1982) (billing records); Commonwealth v. Melilli, 521 Pa. 405, 555 A.2d 1254, 1258-59 (1989) (pen register), 18 Pa. Cons.Stat. § 5743 (2016) (billing records); but see Hunt, supra, 91 N.J. at 344, 450 A.2d 952.

 See Henderson v. State, 583 So.2d 276, 291-92 (Ala.Crim.App.1990); Ariz.Rev. Stat. § 13-3018 (2016); State v. Hamzy, 288 Ark. 561, 709 S.W.2d 397, 398-99 (1986); Conn. Gen.Stat. § 54-47aa (2016); Del.Code Ann. tit. 11, § 2423(c) (2016); Gibbs v. State, 479 A.2d 266, 272 (Del.1984); Fla. Stat. Ann. § 934.23(4) (2016); Figueroa v. State, 870 So.2d 897, 901 (Fla.Dist.Ct.App.2004); Kesler v. State, 249 Ga. 462, 291 S.E.2d 497, 504 (1982); Idaho Code Ann. § 19-3004A (2016); People v. DeLaire, 240 Ill.App.3d 1012, 183 Ill.Dec. 33, 610 N.E.2d 1277, 1282-83, appeal denied, 151 Ill.2d 569, 186 Ill.Dec. 387, 616 N.E.2d 340 (1993); In re Order for Ind. Bell Tel. to Disclose Records, 274 Ind. 131, 409 N.E.2d 1089, 1090 (1980); State v. Schultz, 252 Kan. 819, 850 P.2d 818, 829-30 (1993); State v. Marinello, 49 So.3d 488, 507-10 (La.Ct.App.2010), cert. denied, 61 So.3d 660 (La.2011); Me.Rev.Stat. Ann. tit. 5, § 200-B(2) (2016); Md.Code Ann., Crim. Proc. § 15-108(a) (2016); Mass. Ann. Laws ch. 271, § 17B (2016); Commonwealth v. Vinnie, 428 Mass. 161, 698 N.E.2d 896, 909-10 (1998); Minn.Stat. Ann. § 388.23 (2016); Fraise v. State, 17 So.3d 160, 163-64 (Miss.Ct.App.2009) (nonnarcotics case); Hastetter v. Behan, 196 Mont. 280, 639 P.2d 510, 511 (1982); Neb.Rev.Stat. Ann. § 86-2,106 (2016); State v. Knutson, 288 Neb. 823, 852 N.W.2d 307, 319-20 (2014), cert. denied, - U.S. -, 135 S.Ct. 1505, 191 L.Ed.2d 442 (2015); N.H.Rev.Stat. Ann. § 7:6-b (2016); State v. Gubitosi, 152 N.H. 673, 886 A.2d 1029, 1034-36 (2005); People v. Di Raffaele, 55 N.Y.2d 234, *152 448 N.Y.S.2d 448, 433 N.E.2d 513, 516 (1982); N.C. Gen.Stat. § 15A-298 (2016); N.D. Cent.Code Ann. § 51-34-04 (2016); State v. Lind, 322 N.W.2d 826, 836-37 (N.D. 1982); State v. Neely, 2012-Ohio-212, ¶¶ 16-26 (Ohio Ct.App.2012); State v. Johnson, 340 Or. 319, 131 P.3d 173, 183-84 (2006); 18 Pa. Cons.Stat. Ann. § 5743 (2016); State v. McGoff, 517 A.2d 232, 234 (R.I.1986); State v. King, 412 S.C. 403, 772 S.E.2d 189, 197 (Ct.App.2015); Tenn.Code Ann. § 24-7-116 (2016); Tex.Code Crim. Proc. Ann. art. 18.21, Sec. 5 (2016); Utah Code Ann. § 77-23b-4 (2016); Am. Fork City v. Smith, 258 P.3d 634, 636 (Utah Ct.App.2011); Va.Code Ann. § 19.2-70.3 (2016); State v. Clark, 232 W.Va. 480, 752 S.E.2d 907, 921 (2013); Saldana v. State, 846 P.2d 604, 611-12 (Wyo.1993); see also Williams v. Commonwealth, 213 S.W.3d 671, 683 (Ky.2006) (embracing third-party doctrine generally); State v. Plunkett, 473 S.W.3d 166, 175-76 (Mo.Ct.App.2015) (same); State v. Rolfe, 825 N.W.2d 901, 910 (S.D.2013) (following third-party doctrine for ISP records); State v. Simmons, 190 Vt. 141, 27 A.3d 1065, 1070 n. 5 (2011) (noting no history of rejecting third-party doctrine); but see Miss.Code. Ann. § 41-29-536 (2016) (probable cause standard for narcotics cases). The State canvassed other Attorneys General and represents that prosecutors in New Mexico use subpoenas to obtain telephone billing records.

 Cal.Penal Code § 1524.3 (2016); Mich. Comp. Laws Serv. § 767A.3 (2016); Wis. Stat. Ann. § 968.375 (2016).

 See People v. Corr, 682 P.2d 20, 26-28 (Colo.1984); State v. Eisfeldt, 163 Wash.2d 628, 185 P.3d 580, 585 (2008). The State represents that prosecutors in Alaska and Nevada use search warrants to obtain telephone billing records; notwithstanding the authority cited above in note 7, prosecutors in South Carolina and Wyoming reportedly do so as well.